**ALLEGHANY
CORPORATION, Plaintiff,**

**v.**

**Earl R. POMEROY, Commissioner of Insurance of the State of North Dakota, Defendant.**

**and**

**The St. Paul Companies, Inc., and St. Paul Insurance Company of North Dakota, Intervening Defendants.**

Civ. No. A1–88–096.

United States District Court,
D. North Dakota,
Southwestern Division.

Oct. 31, 1988.

H. Patrick Wier and Harlan G. Fuglesten, Fargo, N.D., Thomas Tinkham, Richard Bond and Leslie J. Anderson, Minneapolis, Minn., for plaintiff.

Merle T. Pederson, Bismarck, N.D., for Pomeroy.

Patrick Durick, Joel W. Gilbertson and David E. Reich, Bismarck, N.D., and James A. McDermott, James A. Strain, Eric R. Moy, Peter J. Rusthoven and David Hamilton, Indianapolis, Ind., for amici curiae.

Thomas O. Smith, Bismarck, N.D., for St. Paul Companies.

## MEMORANDUM AND ORDER

CONMY, Chief Judge.

The essential facts necessary to resolve the present suit are not disputed by the parties. Those facts, as stated in this court's previous decision, are as follows:

Alleghany Corporation is a Delaware corporation with its headquarters in New York. Its common stock is listed and traded on the New York Stock Exchange. Alleghany, through its subsidiaries, is engaged in the sale and underwriting of title insurance and in the property and casualty insurance business.

St. Paul Companies, Inc. is incorporated under the laws of the state of Minnesota with its headquarters located in St. Paul, Minnesota and is an insurance holding company for one of the largest groups of property-liability insurance underwriters in the United States. Through its subsidiaries it is engaged in investment banking, insurance, and reinsurance brokerage activities. St. Paul Companies, Inc. wholly owns St. Paul Fire and Marine Insurance Company, a Minnesota corporation with its home office in St. Paul, Minnesota, which in turn wholly owns the St. Paul Insurance Company of North Dakota. St. Paul Insurance Company of North Dakota is a North Dakota corporation with its offices located in Fargo, North Dakota, and is a writer of professional liability insurance for physicians in North Dakota.

In July, 1987, Alleghany began to purchase common stock of St. Paul Companies, Inc. According to Alleghany it currently owns directly or through its subsidiaries approximately 9.2 percent of about 46,301,-857 shares of outstanding common stock of St. Paul Companies, Inc. Alleghany seeks to acquire up to 20% of the stock.

In order to acquire the additional stock, however, Alleghany, pursuant to Minnesota's Insurance Holding Company Act, was required to obtain prior approval from the Commissioner of the Minnesota Department of Commerce. The Insurance Holding Company Act provides that the Commissioner of Commerce must give his approval for acquisition of control of a domestic insurer so long as the acquisition does not cause a material change in St. Paul Companies' business which would be unfair to policyholders or not in the public interest.

On November 19, 1987, Alleghany filed an Amended Form A pursuant to section 60D.02 of the Minnesota Insurance Holding Company Act proposing to acquire up to 20% of the stock of St. Paul Companies, Inc. On January 11, 1988, a Deputy Commissioner of the Minnesota Department of Commerce gave Alleghany approval to acquire up to and including 20% of the common stock of the St. Paul Companies, Inc. The Deputy Commissioner determined that Alleghany's plans and proposals were not unfair and unreasonable to the policyholders of the Insurers and that they were not contrary to the public interest within the meaning of the Insurance Holding Company Act. The decision of the Deputy Commissioner is currently under review in the Minnesota courts.

Like Minnesota, eight other states, including North Dakota, required Alleghany to obtain approval for the acquisition of more than 10% of the stock of St. Paul Companies, Inc. pursuant to similar Insurance Holding Company Acts because St. Paul Companies, Inc. had a wholly owned subsidiary in each of those states.[1] In North Dakota, the Act forbids any person from acquiring control of a domestic insurer unless the person files a disclosure state-

---

1. Forty-seven (47) states have enacted some type of Insurance Holding Company Act patterned on the Model Insurance Holding Company Systems Regulatory Act. Including the domicile state of Minnesota, Alleghany was required to obtain approval from nine states in order to acquire more than 10% of the stock of St. Paul Companies, due to subsidiaries that St. Paul Companies had in the eight other states. These other states include North Dakota, California, Indiana, Nebraska, New York, Texas, Wisconsin, and Delaware. An application for approval was also filed with Illinois, but later withdrawn due to an Illinois statute which provides an exemption in cases in which the holding company whose securities are being purchased is "subject to requirements in the jurisdiction of its domicile which are substantially similar to those contained" in Illinois.

ment as required by the Act and the acquisition has been approved by the commissioner. N.D.Cent.Code § 26.1–10–03 (Cum. Supp.1987). For purposes of the North Dakota Act a domestic insurer includes any person in control of a domestic insurance company. *Id.* Further, control is presumed to exist if any person, directly or indirectly, owns, or otherwise controls, ten percent or more of the voting securities. N.D.Cent.Code § 26.1–10–01(1) (Cum.Supp. 1987). Consequently, Alleghany was required to obtain approval from the North Dakota Insurance Commissioner before any further acquisitions could be made because St. Paul Insurance Company of North Dakota is a wholly owned subsidiary of the St. Paul Fire & Marine Insurance Company, which is wholly owned by the St. Paul Companies, Inc. Thus on November 23, 1987, Alleghany filed with the Commissioner its proposal to acquire up to 20% of the stock of the St. Paul Companies, Inc. pursuant to section 26.1–10–03 of the North Dakota Century Code. On March 29, 1988, the Insurance Commissioner ordered that Alleghany could not proceed with its proposed acquisition. Contrary to the findings of Minnesota (the state of domicile for St. Paul Companies, Inc.) the Insurance Commissioner of North Dakota concluded that the 20% acquisition was not in the best interest of the public nor in the interest of the policyholders.

Thereafter Alleghany filed the present action in federal district court seeking declaratory and injunctive relief. Specifically Alleghany seeks to have section 26.1–10–03 of the Insurance Holding Company Act declared invalid and unenforceable and to enjoin the Defendant from invoking said section. Alleghany contends that the North Dakota Act, specifically section 26.1–10–03, violates the Commerce, Supremacy, and Due Process Clauses of the United States Constitution. As indicated in this court's order dated August 11th, 698 F.Supp. 809, the issues raised in this case are ideally suited for resolution by summary judgment. Accordingly, the parties have filed cross motions for summary judgment. Several of the parties have also requested oral argument on the motions. Having

been literally inundated with voluminous briefs on the issues, however, the court fails to see what else could be said at oral argument which was not covered in the briefs. The court finds that oral argument will not aid the court in its determination and resolution of the issues presented for review. Accordingly, the requests for oral argument are denied.

Alleghany contends that section 26.1–10–03(1) of the North Dakota Century Code violates the Commerce Clause because it prevents it from purchasing ten percent or more of common stock of an out-of-state insurance holding company from willing sellers in interstate commerce without receiving approval from the North Dakota Insurance Commissioner. It asserts that the North Dakota Act directly regulates interstate commerce in securities and imposes a burden on interstate commerce that is clearly excessive in comparison with its putative benefits in the state of North Dakota. The Defendants argue that the actions of the State have been authorized by the Congress and are therefore invulnerable to constitutional attack under the Commerce Clause.

The Commerce Clause provides that "Congress shall have Power ... to regulate Commerce ... among the several States." U.S. Const. Art. I, § 8, cl. 3. The Court has held that the Commerce Clause contains an implied limitation on the power of the States to interfere with or impose burdens on interstate commerce. *See Western & Southern Life Insurance Company v. State Board of Equalization of California,* 451 U.S. 648, 101 S.Ct. 2070, 68 L.Ed.2d 514 (1981). Congress may, however, confer upon the States the ability to restrict interstate commerce. *Id.* Thus if Congress authorizes that the States may freely regulate an area of interstate commerce, any action taken by the State within the scope of that authorization is invulnerable to Commerce Clause challenge. *Id.* at 653, 101 S.Ct. at 2075; *Northeast Bancorp, Inc. v. Board of Governors,* 472 U.S. 159, 105 S.Ct. 2545, 86 L.Ed.2d 112 (1985).

The Defendants contend that in the instant case the Commerce Clause is not

applicable since Congress has removed all Commerce Clause limitations on the State's authority to tax and regulate the business of insurance with the passage of the McCarran–Ferguson Act. The Act provides in relevant part:

> **Declaration of Policy.** The Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States.
>
> (a). **State regulation.** The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.
>
> (b). **Federal regulation.** No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance....

15 U.S.C. §§ 1011, 1012. The McCarran–Ferguson Act was Congress' response to the Court's decision in *United States v. South–Eastern Underwriters Ass'n,* 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), wherein the Court held for the first time that insurance is subject to the Commerce Clause. Prior to the *South–Eastern* decision the Court had held that the "issuing of a policy of insurance is not a transaction of commerce." *Paul v. Virginia,* 8 Wall 168, 19 L.Ed. 357 (1869); *Hooper v. California,* 155 U.S. 648, 15 S.Ct. 207, 39 L.Ed. 297 (1895). Congress reacted quickly to the South–Eastern decision due to concerns it had over the effect the decision would have on what had become traditional state regulations of insurance. *Securities & Exchange Commission v. National Securities Inc.,* 393 U.S. 453, 458, 89 S.Ct. 564, 567, 21 L.Ed.2d 668 (1969) *citing Prudential Insurance Co. v. Benjamin,* 328

U.S. 408, 429, 66 S.Ct. 1142, 1154, 90 L.Ed. 1342 (1946).

The Defendants contend that the McCarran–Ferguson Act eliminated all Commerce Clause limitations on the States power to regulate and tax the business of insurance companies whether or not those affairs were related to the "business of insurance." Alleghany's position is that the Act provides protection only to those state laws which regulate the "business of insurance" and does not apply to other aspects of an insurance company.

The legislative history indicates that Congress had two major objectives in mind in enacting the Act. Congress' primary concern was to "declare that the continued regulation and taxation by the several States of the *business of insurance* is in the public interest." [2] (emphasis added). Hence, the Act was Congress' attempt to assure that the activities of insurance companies in dealing with their policyholders would remain subject to the existing and future state systems for regulating and taxing the "business of insurance." *Securities & Exchange Commission,* 393 U.S. at 459, 89 S.Ct. at 568. This objective was accomplished under sections 1011 and 1012(a) of title 15 of the United States Code. Congress' secondary objective in the wake of the *South–Eastern* decision was to protect the cooperative ratemaking efforts because of the widespread view that it was very difficult to underwrite risks in an informed and responsible way without intra-industry cooperation. *Group Life & Health Insurance Company v. Royal Drug Company,* 440 U.S. 205, 218, 221, 99 S.Ct. 1067, 1076, 1078, 59 L.Ed.2d 261 (1979). Consequently, Congress excluded application of the anti-trust laws to the business of insurance so long as it was regulated by state law. *See* 15 U.S.C. § 1012(b).

The Defendants contend the phrase "business of insurance" applies only in the context of the anti-trust provision of the Act. The Defendants cite several Supreme Court cases for the proposition that states

---

**2.** S.Rep. No. 20, 79th Cong., 1st Sess., 1–2 (1945); H.R.Rep. No. 143, 79th Cong., 1st Sess., 2–3 (1945) *reprinted in* 1945 U.S.Code Cong. & Admin.News 670, 671–72.

are free to regulate the business of insurance and the business of the insurance companies without any Commerce Clause limitation. In *Group Life & Health Insurance Company v. Royal Drug Company* the Court stated, "[t]he McCarran–Ferguson Act operates to assure that the States are free to regulate insurance companies without fear of Commerce Clause attack." *Royal Drug*, 440 U.S. 205, 218–19 n. 18, 99 S.Ct. 1067, 1076–77 n. 18 (1979). The Court further stated, "the McCarran–Ferguson Act freed the States to continue to regulate and tax the business of insurance companies, in spite of the Commerce Clause. It did not, however, exempt the business of insurance companies from the anti-trust laws. It exempted only 'the business of insurance.'" *Id.* Read in a vacuum it would appear that the Defendants position is supported by the above language. But when considered in light of the legislative history, the plain language of the statute, and language from this and other Supreme Court's cases; this court finds that only the "business of insurance" is invulnerable to Commerce Clause attack.

In *Securities & Exchange Commission* the question before the Court was whether an Arizona statute was enacted for the purpose of regulating the business of insurance within the meaning of the McCarran–Ferguson Act. *Securities & Exchange Commission, supra*, 393 U.S. at 457, 89 S.Ct. at 567. Construing the application of the Act to the insurance industry, the Court stated:

> The statute did not purport to make the States supreme in regulating all activities of insurance *companies;* its language refers not to the persons or companies who are subject to state regulation, but to laws "regulating the *business* of insurance." Insurance companies may do many things which are subject to paramount federal regulation; only when they are engaged in the "business of insurance" does the statute apply.

*Id.* at 459–60, 89 S.Ct. at 568–69. Certainly Congress intended the McCarran–Ferguson Act to restore state taxing and regulatory power over the business of insurance, but it did not intend to give the states unlimited power over the business of insurance companies. With the passage of the Act, Congress gave the states the authority to regulate and tax only the "business of insurance." *Western & Southern Life Ins. Co. v. State Board of Equalization*, 451 U.S. 648, 653, 101 S.Ct. 2070, 2075, 68 L.Ed.2d 514 (1981). Accordingly, when a state activity is aimed at regulating the business of insurance it is invulnerable to Commerce Clause challenges, but where the activity regulates in an area other than the "business of insurance" the McCarran–Ferguson Act does not shield it from the Commerce Clause despite the fact that the law applies to insurance companies. Such a conclusion is also supported by the plain language of the Act itself. Sections 1011 and 1012(a) expressly refer to the "business of insurance" and not to other activities of the insurance companies.

Regardless, the Defendants assert that the North Dakota Holding Company Act does fall with the ambit of the McCarran–Ferguson Act because, it "undoubtedly regulates the 'business of insurance.'" The Defendants contend that the North Dakota Statute relates to the business of insurance because it focuses on the relationship between the insurance company and the policyholder. They insist that the North Dakota Act protects the policyholders interests by guaranteeing that the financial condition of the acquiring party will not jeopardize the financial condition of the insurance company, and that the plans and proposals of the acquiring party are not unfair to the policyholders, and that the competence, experience, and integrity of the acquiring party will not jeopardize the interests of the policyholders. Alleghany on the other hand argues that the North Dakota Act is not aimed at the business of insurance but rather regulates securities transactions outside the scope of the McCarran–Ferguson Act.

In considering whether a state regulation is aimed at regulating the business of insurance, the Supreme Court stated:

> Congress was concerned with the type of state regulation that centers around the

contract of insurance, the transaction *Paul v. Virginia* held was not "commerce." The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement—these were the core of the "business of insurance." Undoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that they to must be placed in the same class. But whatever the exact scope of the statutory term, it is clear where the focus was—it was on the relationship between the insurance company and the policyholder. Statutes aimed at protecting or regulating this relationship, directly or indirectly are laws regulating the "business of insurance."

*Securities & Exchange Commission, supra,* 393 U.S. at 460, 89 S.Ct. at 568. Under the Defendants' analysis of Court's language as stated above, any statute which may provide some benefit to the policyholders of an insured is necessarily the business of insurance. Even the most absurd regulation could withstand constitutional attack if some benefit could be found to inure to the policyholders if the court were to accept the Defendants' rationale. Every business decision made by an insurance company has some impact on its reliability, its ratemaking, and its status as a reliable insurer and would thus fall within the meaning of the business of insurance. *Royal Drug,* 440 U.S. at 216, 99 S.Ct. at 1075. The Court rejected such a broad interpretation in *Royal Drug* wherein Blue Shield offered policies entitling insured persons to purchase prescription drugs for $2 from any pharmacy participating in a Pharmacy Agreement. *Id.* If policyholders purchased prescription drugs from a non-participating pharmacy they would have to pay more than would be required if purchased from a participating pharmacy. *Id.* at 209, 99 S.Ct. at 1072. The Court concluded that while the Agreements may inure to the benefit of the policyholder in the form of lower premiums because they allow Blue Shield to minimize costs and maximize profits, they do not constitute the business of insurance. *Id.* at 214, 99 S.Ct. at 1074.

The legislative history of the Act indicates that Congress intended a significantly more limited application of the phrase. The Act was intended to restore to the states the regulatory and taxing power that they enjoyed prior to the *South–Eastern* decision. *Securities & Exchange Commission,* 393 U.S. at 459, 89 S.Ct. at 568. Prior to *South–Eastern* the states had the power and were not restrained by the Commerce Clause to regulate and tax the activities of foreign insurance companies which sell policies within their boundaries even though the execution of those policies involved communication of information and movement of persons, moneys, and papers in interstate commerce. *South–Eastern,* 322 U.S. at 534, 64 S.Ct. at 1164. Congress sought to give credence to the state systems for regulating the contract of insurance, the type of policy, its reliability, and enforcement; but did not intend to give the states unlimited power over all activities of insurance companies. *Securities & Exchange Commission,* 393 U.S. at 459–60, 89 S.Ct. at 568–69.

The Court has recently recognized three important criteria relevant in determining whether an activity is the business of insurance as that term is intended in the McCarren–Ferguson Act. First, whether the practice has the effect of transferring or spreading a policyholder's risk; second, whether the practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entities within insurance industry. *Union Labor Life Ins. Co. v. Pireno,* 458 U.S. 119, 129, 102 S.Ct. 3002, 3008, 73 L.Ed.2d 647 (1982). These factors are not limited to anti-trust cases as suggested by the Defendants. *Gordon v. U.S. Dept. of Treasury,* 846 F.2d 272 (4th Cir.1988).

The statute at issue here certainly does not entail any transferring or spreading of risk from the policyholder to the insured. As stated by the Court, "[t]he transfer of risk from insured to insurer is effected by means of the contract between the parties

—the insurance policy—and that transfer is complete at the time that the contract is entered." *Id.*, 458 U.S. at 130, 102 S.Ct. at 3009. The regulation at issue here is not related to the underwriting of those risks but is an attempt to control stock ownership. The obligation of St. Paul under the insurance policies is separate from the issue of who is in control. Guaranteeing that credible and reliable management are in control of the insurance companies does not constitute the spreading and underwriting of policyholders' risk as articulated in *Royal Drug* and *Pireno.*

Analyzing the statute under the second *Pireno* criteria, the area being regulated is not an integral part of the policy relationship between the insurer and the insured. The focus of the second criteria is the contract between the insurer and the insured including the type of policy, its reliability, interpretation, and enforcement. *See Royal Drug,* 440 U.S. at 215–16, 99 S.Ct. at 1075–76. The policyholder is only concerned with whether his claim is going to be paid, not who is controlling the direction of the company. *See Pireno,* 458 U.S. at 132, 102 S.Ct. at 3010. Whether the claim will be paid or not is dependent on the terms and conditions of the insurance contract and its enforcement.

Finally, the challenged regulation is not limited to entities within the insurance industry. The regulation has a profound effect on investors and stockholders who own stock or seek to own stock in an insurance company. It restricts the ability of a stockholder out-of-state from selling his/her interest to a willing purchaser if the purchase would give the purchaser more than 10% control of the company without the prior approval of the insurance commissioner. The regulation does not go to the "core of the business of insurance" as envisioned by the Congress in enacting the McCarran–Ferguson Act and by the Supreme Court in its interpretation of the Act.

Based on the foregoing—section 26.1–10–03 of the North Dakota Century Code does not satisfy any of the criteria developed to ascertain if the statute regulates the business of insurance. Accord-

ingly, the North Dakota statute is not invulnerable to the Commerce Clause. Not every exercise of state power which has an impact on interstate commerce, however, is invalid. The Commerce Clause permits incidental regulation of interstate commerce by the states if the burden on interstate commerce is not excessive in relation to the local interests served. *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). A direct regulation of interstate commerce, however, is absolutely prohibited.

In *Edgar v. MITE Corp.* the Court summarized the state of law regarding direct regulations of interstate commerce as follows:

"[A] state statute which by its necessary operation directly interferes with or burdens [interstate] commerce is a prohibited regulation and invalid, regardless of the purpose with which it was enacted." The Commerce Clause also precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State.... "[A]ny attempt 'directly' to assert extraterritorial jurisdiction over persons or property would offend sister States and exceed the inherent limits of the State's power."

*Edgar v. MITE Corp.,* 457 U.S. 624, 642–43, 102 S.Ct. 2629, 2640–41, 73 L.Ed.2d 269 (1982) (citations omitted). In *Edgar* the Illinois Business Take–Over Act was being challenged. *Edgar,* 457 U.S. at 634, 102 S.Ct. at 2636. The statute at issue required a tender offeror to notify the Secretary of State and a target company of its intent to make a tender offer and the material terms of the offer 20 business days before the offer became effective. *Id.* at 634, 102 S.Ct. at 2636. During the 20 period the offeror was prohibited from communicating with the shareholders of the target. *Id.* at 635, 102 S.Ct. at 2637. The Court concluded that the offer for a publicly held corporation was subject to the Commerce Clause since the means to communicate it was through the mails or other means of interstate commerce and the transaction itself would possibly entail interstate commerce. *Id.* at 641, 102 S.Ct. at

2640. Unless one complied with the Illinois Act, however, it prevented the offeror from making its offer and concluding interstate transactions, not only with Illinois stockholders, but with stockholders living in other states and having no connection with Illinois. *Id.* at 642, 102 S.Ct. at 2640. The Court concluded that because the Illinois Act purported to regulate directly and to interdict interstate commerce, including commerce wholly outside the State, it was invalid. *Id.* at 643, 102 S.Ct. at 2641.

■ This court finds the *Edgar* decision controlling since it is directly analogous with the present case. Under the North Dakota Act the insurance commissioner has the authority to restrain Alleghany from purchasing additional shares of stock in St. Paul Companies, Inc. This authority exists despite the fact that Alleghany, a Delaware corporation, has received authority from the Commissioner of the Minnesota Department of Commerce to acquire up to and including 20% of the common stock of St. Paul Companies, Inc., a Minnesota corporation. The Act is applicable even if none of the shareholders of St. Paul are citizens of the State of North Dakota. This court sees the statute as purely economic protectionism of those currently in control of the insurance company. After a careful review of the statute and its effect on interstate commerce the court finds that it violates the Commerce Clause as a direct regulation on interstate commerce because of its extraterritorial effects. Since the court finds that the North Dakota statute violates the Commerce Clause, it is not necessary to resolve the Supremacy and Due Process issues raised by Alleghany.

The court hereby DECLARES that section 26.1–10–03(1) of the North Dakota Century Code is an unconstitutional violation of the commerce clause as it presently exists. Accordingly, it is ORDERED that the North Dakota Insurance Commissioner is enjoined from precluding Alleghany from going ahead with its proposed acquisition of St. Paul Companies, Inc. stock.