FIRST BANK OF BUFFALO,
Plaintiff and Appellant,

v.

Kent CONRAD, North Dakota Tax Commissioner, Defendant and Appellee.

FIRST NATIONAL BANK, HETTINGER, Plaintiff and Appellant,

v.

Kent CONRAD, North Dakota Tax Commissioner, Defendant and Appellee.

DAKOTA BANK AND TRUST COMPANY, Plaintiff and Appellant,

v.

Kent CONRAD, North Dakota Tax Commissioner, Defendant and Appellee.

Civ. Nos. 10573 to 10575.

Supreme Court of North Dakota.

May 23, 1984.

Lamb, Schaefer, McNair & Larson, Fargo, for First State Bank of Buffalo, First Nat. Bank, Hettinger, and Dakota Bank and Trust Co., plaintiffs and appellants; argued by Gregory L. Thompson, Fargo.

Albert R. Hausauer, Asst. Atty. Gen., Bismarck, for defendant and appellee.

SAND, Justice.

The First State Bank of Buffalo, the First National Bank of Hettinger, and the Dakota Bank and Trust Company [the banks], on or before 16 March 1983 filed separate claims for tax refunds with the Tax Commissioner for the taxes paid pursuant to North Dakota Century Code Chapters 57–35 and 57–35.2. The claims for refund were predicated on the assumption that Ch. 57–35 and Ch. 57–35.2 violated 31 U.S.C. § 742 (now 31 U.S.C.A. § 3124). The Tax Commissioner, by letter dated 3 May 1983, denied each claim for refund. The banks, on 3 June 1983, appealed to the district court which upheld the denial. The Tax Commissioner filed a motion to dismiss the appeal or, in the alternative, to remand the matter to the Tax Commissioner for a hearing to develop a record. The district court granted the motion to dismiss. The banks then appealed to this Court.

The banks, relying upon *Memphis Bank and Trust Company v. Garner*, 459 U.S. 392, 103 S.Ct. 692, 74 L.Ed.2d 562 (1983), contended that the North Dakota tax discriminatorily exempted income from bonds for projects under § 40–57–03(4) but did not exempt similar federal projects and as such the North Dakota Act was invalid.

In *Memphis*[1] the court considered a Tennessee statute that imposed a tax on the net earnings of banks doing business within the state, and defined net earnings to include income from obligations of the United States and its instrumentalities but excluded interest earned on the obligations of Tennessee and its political subdivisions. The court found that the tax imposed by Tennessee could not be characterized as nondiscriminatory under the exception for nondiscriminatory franchise taxes as provided for in 31 U.S.C. § 742.

31 U.S.C. § 742 [now U.S.C.A. § 3124] provided as follows:

"Except as otherwise provided by law, all stocks, bonds, Treasury notes, and other obligations of the United States, shall be exempt from taxation by or under State or municipal or local authority. This exemption extends to every form of taxation that would require that either the obligations or the interest thereon, or both, be considered, directly or indirectly, in the computation of the tax, *except nondiscriminatory franchise or other nonproperty taxes in lieu thereof imposed on corporations and except estate taxes or inheritance taxes.*" [Emphasis ours.]

The privilege tax paid by the banks was based upon the net income of the institution subject to the tax.

The statutes in question in the instant case are as follows:

57–35–04. "BASIS OF TAX. The liability for the tax imposed by this chapter shall arise upon the first day of each calendar year, and shall be based upon and measured by the net income of each bank or trust company for the preceding calendar year, including the amount of its income from tax-exempt securities, *except for income from bonds for a project as provided for in subsection 4 of section 40–57–03,* for such year as returned to the tax commissioner and county auditor, and the tax thereon shall be computed at the rate of five percent, but the minimum tax assessable to any one taxpayer shall be fifty dollars." [Underlined language was added in 1979 by Ch. 596 and was removed in 1983 by Ch. 619.]

57–35.2–02. "IMPOSITION AND BASIS OF TAX. An annual tax is hereby imposed upon each bank, trust company, and building and loan association, for the grant to it of the privilege of transacting, or for the actual transacting by it, of business within this state during any part of each tax year, commencing January 1, 1970. The tax shall be based upon and measured by the net income of each bank, trust company, and building and loan association for the preceding calendar year, including the amount of income received from tax-exempt securities, *but excluding the amount of income received from bonds for a project as provided for in subsection 4 of section 40–57–03.* The amount of the tax shall be computed at a rate of two percent of such net income. The liability for the tax imposed by this chapter shall arise upon the first day of each calendar year following the year for which the net income is used as the base for measuring the tax." [Underlined language was added in 1979 by Ch. 596, and was removed in 1983 by Ch. 619.]

"57–35–13. Allocation of Tax. Upon receipt by the county treasurer, from any

---

1. The Court also recently decided a similar issue involving state taxation of federal obligations in *American Bank & Trust Co. v. Dallas County,* — U.S. ——, 103 S.Ct. 3369, 77 L.Ed.2d 1072 (1983). In *Dallas,* however, the issue concerned a Texas property tax on bank shares computed on the basis of the bank's net worth with no deduction for tax-exempt United States obligations. The Court held that the tax violated Rev. Stat. § 3701, 31 U.S.C. § 742 [now 31 U.S.C. § 3124(a) ].

bank or trust company, of the amount of the tax payable under this chapter, he shall apportion and distribute to the state, county, and to the political subdivisions in which such bank or trust company is located, the amount of the tax payment so received by him, *on the basis on which the general real estate tax levy is apportioned and distributed."*

Chapter 57–35, NDCC, does not contain a procedure to be followed in making *ordinary* refunds but contains a provision on overpayments. Section 57–35–12, regarding overpayments, in part provides:

"If said bank or trust company shall be found to have overpaid said tax and entitled to a refund, it may deduct the amount of such refund from such tax as may be payable by it for the next succeeding calendar year."

The only provision for refund in Ch. 57–35.2 is found in § 57–35.2–05 which, in part, states:

"If such bank, trust company, or building and loan association is found to have overpaid its tax and to be entitled to a refund, such refund shall be made by the commissioner from the general fund of the state treasury."

Significantly, this only applies to instances where the bank or trust company has overpaid its tax.

Under NDCC § 57–35.2–04, the tax commissioner deposits the taxes paid into the state general fund. These funds, pursuant to § 57–58–01, are certified by the tax commissioner to the state treasurer for payment to the respective county treasurers, who, in turn, allocate and remit to the counties, cities, park boards, school districts, airport authorities, townships, and all other units of government having the authority to levy taxes, that amount of revenue which is received from the state in the same ratio as he would have distributed the revenues from the personal property tax. The county treasurer must adjust those amounts by an increase or decrease in the real property taxes as levied by each taxing authority, according to the formula provided in NDCC Ch. 57–58.

An analysis of NDCC § 57–58–01 clearly discloses that the state is merely a funnel through which these taxes passed. The tax ultimately went to the various taxing authorities. Section 57–58–01 also provides that the state tax commissioner shall determine the amount due based upon personal property taxes levied for the North Dakota state medical center. The amount of taxes certified is to be computed in accordance with the formula provided for computing the amounts to be certified and paid to the counties. The state treasurer, upon receiving the certification from the tax commissioner, must transfer from the general fund to the credit of the North Dakota state medical center, the amount certified.

To our knowledge, the only real estate tax that went to the state was pursuant to Article X, § 10 of the North Dakota Constitution, which provides for a one mill levy upon all taxable property to be put in the state treasury and credited to the North Dakota state medical center at the University of North Dakota.

These provisions clearly illustrate that the state does not retain any of the funds. If anything at all, the state incurred the expenses for administering the program. Thus, while the state temporarily may have been the custodian of these funds, it is not the custodian in the sense that it retained the funds for state use.

The record and statutes do not disclose that the Legislature appropriated any funds from which refunds could be made. The statutory provisions regarding overpayment are not designed to cover applications for refunds such as we have here.

In this respect we believe that the rationale expressed in *Stark County v. State,* 160 N.W.2d 101 (N.D.1968), is applicable. In *Stark County* this Court rejected a claim by the county that it was entitled to additional money from the Motor Vehicle Registration Fund because of an alleged improper method of distribution. The Court noted there was no showing that the State had used or retained any part of the

moneys which it sought to recover. The Court concluded:

"In fact, it is conceded that such moneys as are claimed by the plaintiff have been paid to other counties under the improper method of allocating the motor-vehicle registration funds to the various counties. Under this situation, the State of North Dakota is not liable to Stark County for any moneys which it has paid to other counties, even though such distribution was, perhaps, improper." *Ibid.* at 107.

■ Similarly, in the present case, the State did not retain any of the funds nor were the funds received for the benefit of the State itself. Rather, the State acted merely as custodian of the funds for purposes of distribution.

■ The *Memphis* decision by the United States Supreme Court does not automatically make the North Dakota statute unconstitutional as it existed prior to the deletions by the 1983 legislature. For that matter, the banks have not demonstrated or presented any facts to show how they were injured as a result of the alleged offensive language in the Act. The banks did not present any evidence that the United States government has projects (bonds) similar to those stated in NDCC § 40–57–03.

■ Furthermore, assuming arguendo, that chapters 57–35 and 57–35.2 contained offensive language, under the provisions of NDCC § 1–02–20, the court, if the statute were challenged, could invalidate and remove the offensive or damaging language without disturbing the rest of the law. The declaration of part of a law as being unconstitutional does not require a court to also declare the remainder void, unless all provisions are so connected and dependent upon each other that it cannot be presumed that the legislature would have enacted the valid sections without the unconstitutional sections. *Arneson v. Olson,* 270 N.W.2d 125, 137 (N.D.1978). In this instance there is no question that § 57–35–04 and § 57–35.2–02 could have remained operative without the offensive language. This is

illustrated by the fact that in 1979 the alleged offensive language was put in and in 1983 it was taken out. This was accomplished without modifying any of the other provisions of the Act. We repeat, the banks have failed to establish how they were injured or damaged as a result of the alleged "offensive language."

■ Again, assuming arguendo, that the language is unconstitutional and in violation of the federal act, and that the banks would be successful against the state, would the state then have to proceed to recover this tax money from the various counties, townships, cities, park boards, etc., including the medical center at the University of North Dakota? As noted earlier, the banks failed to establish how they were injured; which raises another point, may the banks challenge the validity of the statute because it may harm someone else? We do not believe the banks could. See *State v. Woodworth,* 234 N.W.2d 243 (N.D.1975).

■ Furthermore, NDCC Ch. 28–32, the Administrative Agencies Practice Act, is not designed to resolve constitutional questions. Neither do administrative agencies have the authority to accomplish this.

■ NDCC Ch. 32–23, the Declaratory Judgment Act, is specifically designed to bring an action challenging the constitutionality of statutes, ordinances, etc. Section 32–23–11 provides that the attorney general must be served with a copy of the proceedings and is entitled to be heard. This, however, was not accomplished by the banks in their attempted proceedings under the Administrative Agencies Practice Act. In this respect see *Ford Motor Company v. State, et al.,* 59 N.D. 792, 231 N.W. 883 (1930), wherein the parties proceeded by action rather than under the Administrative Agencies Practice Act.

■ Basically, administrative agencies are creatures of legislative action. As such, legal logic compels the conclusion that the agencies have only such authority or power as is granted to them or necessar-

ily implied from the grant. 1 Am.Jur.2d *Administrative Law* §§ 70, 72, 73. As a general rule, administrative agencies do not determine constitutional issues, especially those under which they are to act. 1 Am.Jur.2d *Administrative Law* § 185, p. 989; 73 C.J.S. *Public Administrative Law and Procedure*, § 65, pp. 535, 536. To make the system of administrative agencies function the agencies must assume the law to be valid until judicial determination to the contrary has been made. *Ibid.*

The United States Supreme Court, in *Davies Warehouse Co. v. Bowles*, 321 U.S. 144, 64 S.Ct. 474, 88 L.Ed. 635 (1944), said:

"Certainly no power to adjudicate contitutional issues is conferred on the administrator [administrative agency]."

Similarly, the Washington Supreme Court, in *Bare v. Gorton*, 84 Wash.2d 380, 526 P.2d 379 (1974), said that even if exhaustion of administrative remedies were applicable or required in certain instances, such procedure is unwarranted and unnecessary where the constitutionality of the very law in question is raised. The court then, on page 381, said:

"An administrative body does not have authority to determine the constitutionality of the law it administers; only the courts have that power. *United States v. Kissinger*, 250 F.2d 940 (3 Cir.1958); *cert. denied*, 356 U.S. 958, 78 S.Ct. 995, 2 L.Ed.2d 1066 (1958). 3 K. Davis, Administrative Law Treatise, § 20.04 at 74 (1958)."

Also, in *Buckeye Industries, Inc. v. Secretary of Labor*, 587 F.2d 231 (5 Cir.1979), the Court said:

"No administrative tribunal of the United States has the authority to declare unconstitutional the act which it is called upon to administer. *Montana Chapter of Association of Civilian Technicians v. Young*, 514 F.2d 1165, 1167–8 (9 Cir. 1975). See *Oestereich v. Selective Service Board*, 393 U.S. 233, 242, 89 S.Ct.

414 [418] 21 L.Ed.2d 402 (1968); *Public Utilities Commission v. United States*, 355 U.S. 534, 539, 78 S.Ct. 446 [450] 2 L.Ed. 470 (1958)."

A careful review of the provisions of NDCC Ch. 28–32, the Administrative Agencies Practice Act, discloses that no authority has been given, expressly or implicitly, to the administrative agencies to declare any law unconstitutional. The issue in the instant case is not comparable to a decision of an agency which per se violated the constitutional rights of the party, as provided for in § 28–32–19(2), as amended, which sets forth the scope of and procedure on appeal from determinations of administrative agencies. In this instance it is the very law which the administrative agency is to administer that is being challenged.

■ The banks erroneously relied upon *Langer v. Gray*, 73 N.D. 437, 15 N.W.2d 732 (1944), as authority to proceed under the administrative practice act. In *Langer* the constitutionality of the statute in question was not challenged. The basic issue was whether or not the tax commissioner acted within the statutory time. [*Langer v. Gray*, 75 N.D. 1, 25 N.W.2d 89 (1946)].

Under the present proceedings all parties of interest including counties, cities, park boards, and other governmental bodies authorized to levy taxes, were not given an opportunity to be heard. Nevertheless, they are the bodies which would suffer the financial consequences if the proceeding were successful. This raises the issue of due process, particularly the right to be heard.

■ Finally, we note that the taxes were not paid under protest.[2] The weight of authority is to the general effect that a payment of taxes, with knowledge of all the facts, is not rendered involuntary by the fact that it was paid in the mistaken belief that the statute or ordinance under which it was levied was valid. *Manufac-*

2. Section 4 of chapter 619, S.L. 1983, provides:
"This Act is effective for taxable years beginning after December 31, 1981. No bank, trust company, or building and loan associa-

tion may claim a refund or credit for taxes paid under this chapter for years before the effective date unless the taxes were timely paid under protest."

*turer's Casualty Ins. Co. v. Kansas City,* 330 S.W.2d 263, 265 (Mo.App.1959); see 72 Am.Jur.2d *State & Local Taxation,* § 1087, p. 349. Generally, in the absence of a statute to the contrary, a person who has paid a license fee or tax which is illegal or in excess of the sum which might lawfully be exacted cannot recover the amount paid if the payment was made voluntarily with full knowledge of the facts, although it was made in good faith, through a mistake or in ignorance of the law, unless the recovery is permitted by an agreement entered into at the time the payment was made. *Ibid.*

For the reasons stated herein, the judgment of the district court affirming the decision of the Tax Commissioner is affirmed.

ERICKSTAD, C.J., and VANDE WALLE, PEDERSON and GIERKE, JJ., concur.