898 F.2d 1314
 1990-1 Trade Cases 69,006
 ALLEGHANY CORPORATION, Appellee,
v.
Earl R. POMEROY, Commissioner of Insurance of the State of
North Dakota, Appellant,
and
St. Paul Companies, Inc., a Minnesota corporation, and St.
Paul Insurance Company of North Dakota, a North
Dakota insurance company, Intervenors.
ALLEGHANY CORPORATION, Appellee,
v.
Earl R. POMEROY, Commissioner of Insurance of the State of
North Dakota, and St. Paul Companies, Inc., a Minnesota
corporation, and St. Paul Insurance Company of North Dakota,
a North Dakota insurance company, Appellants.
 Nos. 89-5033, 89-5034.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 12, 1989.
Decided Feb. 27, 1990.
Concurring and Dissenting Opinion
Filed April 5, 1990.
 
 Nicholas Spaeth, Bismarck, N.D., and Richard J. Urowsky, New York City, for appellant.
 Thomas Tinkham, Minneapolis, Minn., for appellee.
 Before JOHN R. GIBSON and WOLLMAN, Circuit Judges, and BROWN,* Senior Circuit Judge.
 JOHN R. GIBSON, Circuit Judge.
 
 
 1
 This is another case arising out of Alleghany Corporation's efforts to acquire control of the St. Paul Companies. The North Dakota Insurance Commissioner, Earl R. Pomeroy, rejected Alleghany's application to acquire control of the St. Paul Companies, including the St. Paul Insurance Company of North Dakota. Alleghany filed this action in federal court instead of appealing Pomeroy's decision to the North Dakota state courts. The district court refused to abstain, and held that the North Dakota Insurance Holding Company Systems Act, Secs. 26.1-10-01 to 26.1-10-12 (1989), violated the commerce clause of the United States Constitution. The essence of the appellants' argument is that the district court should have abstained under Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), because there was an ongoing state judicial proceeding that both implicated important state interests and afforded Alleghany an adequate opportunity to assert its constitutional claims.[1] We are persuaded by this argument, and we reverse the judgment of the district court.
 
 
 2
 Alleghany sought to purchase over 10% of the stock of St. Paul Companies, Inc., a Minnesota corporation. St. Paul Companies owned all of the stock of St. Paul Fire and Marine Insurance Company, which was also a Minnesota corporation. In turn, St. Paul Fire and Marine had wholly-owned subsidiaries incorporated under the laws of eight states,[2] including St. Paul Insurance Company of North Dakota, incorporated in North Dakota. Alleghany filed in ten states for approval to purchase the St. Paul Companies' stock.[3] The application in North Dakota was necessary because Alleghany hoped to acquire control of a North Dakota domestic insurer. See N.D.Cent.Code Secs. 26.1-10-01, 26.1-10-03. Commissioner Pomeroy denied Alleghany's application because he concluded that a transfer of control was not in the best interest of St. Paul of North Dakota's policyholders. Commissioner of Insurance Decision at 49-50.[4]
 
 
 3
 The district court refused to abstain because it concluded that, under North Dakota law, Alleghany could not raise constitutional claims in state-court review of the administrative procedure. The court based this decision primarily on its analysis of First Bank of Buffalo v. Conrad, 350 N.W.2d 580 (N.D.1984), in which the North Dakota Supreme Court stated that it preferred that constitutional challenges to administrative actions be asserted in a collateral declaratory judgment action rather than on direct appeal of the administrative action. Id. at 584. The district court concluded that Conrad distinguished this case from Huffman v. Pursue, Ltd., 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975). See 698 F.Supp. 809, 812-13 (D.N.D.1988). In Huffman, the Supreme Court applied Younger when state judicial proceedings had not been exhausted. Huffman, 420 U.S. at 607-09, 95 S.Ct. at 1209-11. Since the district court in this case did not abstain, it considered the merits of Alleghany's constitutional arguments in a separate order and concluded that North Dakota's Insurance Holding Company Systems Act directly regulated interstate commerce in violation of the commerce clause of the United States Constitution. See 700 F.Supp. 460, 467 (D.N.D.1988). The court recognized that the McCarran-Ferguson Act, 15 U.S.C. Secs. 1011-1015 (1988), authorizes state insurance regulation, but rejected the argument that North Dakota's regulation of the proposed acquisition was protected from commerce clause scrutiny by the McCarran-Ferguson Act. 700 F.Supp. at 462-66. Then, relying primarily on Edgar v. MITE Corp., 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982), the court held that the North Dakota Insurance Holding Company Systems Act constituted "purely economic protectionism of those currently in control of the insurance company," and thus violated the commerce clause. 700 F.Supp. at 467.
 
 
 4
 We heard this appeal at the same time as the appeal involving Alleghany's attempt to obtain approval in Nebraska. See McCartney, 896 F.2d 1138 (8th Cir. 1990),[5] which we also decide today. In that case, we engaged in a comprehensive discussion of the Younger abstention doctrine. See id. at 1142-1145. In this opinion, we concentrate upon the unique abstention issues presented by North Dakota law.
 
 I.
 
 5
 As we observed in McCartney, although the abstention doctrine of Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 was originally applied in a criminal context, Younger abstention has been extended to administrative proceedings, see Ohio Civil Rights Comm'n v. Dayton Christian Schools, 477 U.S. 619, 627, 106 S.Ct. 2718, 2722-23, 91 L.Ed.2d 512 (1986), and a three-part test articulated in Middlesex County Ethics Committee v. Garden State Bar Association, 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982), guides the abstention analysis in such cases. Pursuant to that test, we must first determine whether there are pending state judicial proceedings. If so, we must decide whether the pending judicial proceedings "implicate important state interests" and if there is "an adequate opportunity in the state proceedings to raise constitutional challenges." Id. at 432, 102 S.Ct. at 2521.
 
 A.
 
 6
 In McCartney, we held that administrative proceedings such as those before the State Insurance Commissioner are judicial proceedings because the Commissioner "investigates, declares and enforces liabilities as they stand on present or past facts and under laws supposed already to exist." McCartney, 896 F.2d at 1143, (quoting New Orleans Pub. Serv. v. Council of New Orleans, --- U.S. ----, 109 S.Ct. 2506, 2519, 105 L.Ed.2d 298 (1989) (NOPSI ) (quoting, in turn, Prentis v. Atlantic Coast Line Co., 211 U.S. 210, 226, 29 S.Ct. 67, 69, 53 L.Ed. 150 (1908))). Similarly, Commissioner Pomeroy's actions in this case were judicial because he applied an established doctrine to a particular set of facts.
 
 
 7
 The next question is whether there are "pending" state proceedings. Instead of attempting to raise its constitutional challenges in the North Dakota state courts, Alleghany filed this federal action. Thus, the claims which are advanced in this federal suit have never been considered, and are not now being considered, by any state court. As the majority in NOPSI recently explained, the Supreme Court has "never squarely faced" the question whether these facts satisfy the Middlesex requirement that there be pending state proceedings. NOPSI, 109 S.Ct. at 2518-19 n. 4.[6] However, even the majority in NOPSI indicated that the Supreme Court's decision in Dayton Christian Schools "suggests, perhaps, that an administrative proceeding to which Younger applies cannot be challenged in federal court even after the administrative action has become final." Id.
 
 
 8
 Even though NOPSI confined the holdings of Middlesex and Dayton Christian Schools to situations in which state administrative proceedings are ongoing, id., it is well-settled that parties may not avoid the strictures of Younger simply by allowing a state judgment to become final. See Huffman v. Pursue, Ltd., 420 U.S. 592, 95 S.Ct. 1200. In Huffman, the Court stated that:
 
 
 9
 Federal post-trial intervention, in a fashion designed to annul the results of a state trial, also deprives the States of a function which quite legitimately is left to them, that of overseeing trial court dispositions of constitutional issues which arise in civil litigation over which they have jurisdiction.... In short, we do not believe that a State's judicial system would be fairly accorded the opportunity to resolve federal issues arising in its courts if a federal district court were permitted to substitute itself for the State's appellate courts.
 
 
 10
 Id. at 609, 95 S.Ct. at 1210-11 (footnote omitted).
 
 
 11
 Unless there is some reason to distinguish Huffman, this element of the Middlesex test is satisfied here because Alleghany failed to present its constitutional claims to the state courts. One significant difference between this case and Huffman is that federal consideration of Alleghany's claims would involve little, if any, duplication of the state litigation. Commissioner Pomeroy was precluded from considering the constitutional questions which are the subject of this federal action, Johnson v. Elkin, 263 N.W.2d 123, 126 (N.D.1978), and Alleghany does not challenge the Commissioner's findings. This distinction makes abstention seem less appropriate in this case than in Huffman. See Steffel v. Thompson, 415 U.S. 452, 462, 94 S.Ct. 1209, 1217, 39 L.Ed.2d 505 (1974). However, just as did the state in Huffman, North Dakota has an interest in exercising a supervisory power over the decisions of state adjudicatory bodies. This interest has two facets.
 
 
 12
 First, the state courts may construe state law in a way which renders a constitutional decision unnecessary. See Pennzoil Co. v. Texaco, 481 U.S. 1, 11, 107 S.Ct. 1519, 1525, 95 L.Ed.2d 1 (1987) (stating that an "important reason for abstention is to avoid unwarranted determination of federal constitutional questions"); see also Ronwin v. Dunham, 818 F.2d 675, 678 (8th Cir.1987); cf. Railroad Comm'n v. Pullman Co., 312 U.S. 496, 499-501, 61 S.Ct. 643, 644-45, 85 L.Ed. 971 (1941) (holding that federal courts should abstain when the determination of an unsettled issue of state law by state courts could avoid the necessity of deciding a federal constitutional question). As the Supreme Court stated in Moore v. Sims, 442 U.S. 415, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979):
 
 
 13
 Almost every constitutional challenge ... offers the opportunity for narrowing constructions that might obviate the constitutional problem and intelligently mediate federal constitutional concerns and state interests. When federal courts disrupt that process of mediation while interjecting themselves in such disputes, they prevent the informed evolution of state policy by state tribunals.
 
 
 14
 Id. at 429-30, 99 S.Ct. at 2380.
 
 
 15
 Second, interests of comity are advanced, and friction reduced, if the courts of a state, rather than the federal courts, determine that the United States Constitution requires the state to alter its practices. The North Dakota Supreme Court has not had this opportunity. In cases such as this, Younger and its progeny stand for the proposition that federal courts should refrain from annulling the decisions of inferior state judicial bodies, see Wooley v. Maynard, 430 U.S. 705, 710-11, 97 S.Ct. 1428, 1433-34, 51 L.Ed.2d 752 (1977); Huffman, 420 U.S. at 608-09, 95 S.Ct. at 1210-11, and we conclude that the interests of comity which underlie Huffman also support abstention in this case.
 
 B.
 
 16
 We follow our conclusion in McCartney that the proceedings before Commissioner Pomeroy implicate important state interests, and thus satisfy the second component of the Middlesex test. McCartney, 896 F.2d at 1144. In conducting this inquiry, we are guided by the Supreme Court's admonition that when courts:
 
 
 17
 inquire into the substantiality of the State's interest in its proceedings [they] do not look narrowly to its interest in the outcome of the particular case--which could arguably be offset by a substantial federal interest in the opposite outcome. Rather, what [they] look to is the importance of the generic proceedings to the state.
 
 
 18
 NOPSI, 109 S.Ct. at 2516 (emphasis in original). See id. at 2516 (substantial interest in regulating intrastate utility rates); Dayton Christian Schools, 477 U.S. at 628, 106 S.Ct. at 2723 (substantial interest in preventing sex discrimination against employees); Middlesex, 457 U.S. at 434, 102 S.Ct. at 2522 (substantial state interest in regulating attorney conduct). The McCarran-Ferguson Act, which states that the "regulation and taxation by the several States of the business of insurance is in the public interest," 15 U.S.C. Sec. 1011, is indicative of North Dakota's interest in regulating the insurance provided to its residents.
 
 
 19
 In addition to its general interest in regulating the insurance industry, North Dakota has a particular interest in regulating the medical liability insurance industry because "approximately 60% of North Dakota physicians are [currently] insured with [St. Paul of North Dakota]." Commissioner of Insurance Decision at 7. Moreover, "[t]he medical malpractice [insurance] field has been particularly volatile and has experienced large losses in recent years. For that reason, the medical malpractice and products liability insurance fields require large reserves relative to capital and surplus." Id. at 38.
 
 C.
 
 20
 As we observed in McCartney, the Supreme Court stated in both Middlesex and Dayton Christian Schools that the third element of the Middlesex test is satisfied whenever a party can assert its constitutional claims in state-court judicial review of the administrative action. Dayton Christian Schools, 477 U.S. at 629, 106 S.Ct. at 2723; Middlesex, 457 U.S. at 436, 102 S.Ct. at 2523. Furthermore, especially "when a litigant has not attempted to present his federal claims in related state-court proceedings, a federal court should assume that state procedures will afford an adequate remedy, in the absence of unambiguous authority to the contrary." Pennzoil, 481 U.S. at 15, 107 S.Ct. at 1528 (emphasis added). When interpreting state law, federal courts "cannot assume that state judges will interpret ambiguities in state procedural law to bar presentation of federal claims." Id.
 
 
 21
 The district court failed to correctly apply this element of the Middlesex test. North Dakota cases lead to the conclusion that there was an adequate opportunity for Alleghany to assert its constitutional claims in state court. The district court summarized North Dakota law as follows:In First Bank of Buffalo v. Conrad, the North Dakota Supreme Court ruled that the Administrative Procedures Act is not designed to resolve constitutional issues. First Bank of Buffalo v. Conrad, 350 N.W.2d 580, 584 (N.D.1984). The court indicated that where one attacks the constitutionality of the very law which the administrative agency is to administer the proper procedure is to seek declaratory judgment pursuant to section 32-23 et seq. of the North Dakota Century Code and not challenge the constitutionality of the law through the Administrative Procedures Act. See Id. at 585. Although the [North Dakota Supreme Court] has found that in certain cases a party may assert that the administrative decision is in violation of constitutional rights of a party, See Application of Otter Tail Power Co., 354 N.W.2d 701, 704 (N.D.1984) and Johnson v. Elkin, 263 N.W.2d 123 (N.D.1978); it has indicated that the more appropriate and helpful method of determining the constitutionality of a particular law would be in a collateral proceeding rather than through the administrative procedures. See Otter Tail Power Co., 354 N.W.2d at 704, and First Bank of Buffalo, 350 N.W.2d at 584.
 
 
 22
 698 F.Supp. at 812-13.
 
 
 23
 The district court's analysis contains no unambiguous indication that Alleghany could not have advanced its constitutional challenge on appeal from the administrative action. Especially since Alleghany did not attempt to present its claims to the North Dakota courts, we will not assume that the North Dakota courts would refuse to hear these claims. See Pennzoil, 481 U.S. at 15, 107 S.Ct. at 1528.
 
 
 24
 Moreover, our examination of North Dakota law convinces us that the North Dakota Administrative Agencies Practice Act does give parties to an administrative proceeding the right to appeal an agency decision to a State district court and, if necessary, to the State Supreme Court. See N.D.Cent.Code Secs. 28-32-15, 28-32-21 (Supp.1989). Section 28-32-19(2) of the North Dakota Century Code specifically provides that courts, when reviewing an administrative agency's decision, may consider whether that decision is "in violation of the constitutional rights of the appellant." Id. (Supp.1989). Furthermore, in Johnson v. Elkin, 263 N.W.2d 123 (N.D.1978), the North Dakota Supreme Court explicitly held that constitutional issues can be considered on appeal from an administrative decision. Id. at 127. See also Froysland v. North Dakota Workers Comp. Bureau, 432 N.W.2d 883, 892 & n. 8 (1988) (reviewing a constitutional challenge to agency action); In re Otter Tail Power Co., 354 N.W.2d 701, 704 (N.D.1984) ("We conclude ... that a collateral proceeding would have been more appropriate and more helpful to a thorough examination of the federal supremacy question, yet we cannot say that under present law the question can only be raised in a collateral proceeding"). Thus, while dictum in North Dakota cases suggests the desirability of raising constitutional issues in collateral proceedings, the North Dakota courts have plainly stated that the issues may be presented on direct appeal. This, under Middlesex, is an adequate opportunity to raise the constitutional issue.
 
 III.
 
 25
 Because we hold that Younger abstention governs this case, we do not proceed to decide the merits. For two reasons, however, we feel compelled to make some further comments regarding the commerce clause issues. First, the judgment of the district court in this case was in conflict with an earlier decision by another judge in the same district. See Walden v. Wigen, No. A1-83-117, slip op. at 9-10 (D.N.D. July 29, 1983) (holding that North Dakota's Insurance Holding Company Systems Act did not violate the commerce clause). Second, we are satisfied that the district court opinion in this case, which was published, is infected with serious error, and we wish to make it abundantly clear that our actions not only deprive that opinion of any precedential value, but also foreclose claims that it has persuasive weight.
 
 
 26
 In making these observations, we stop short of deciding the commerce clause question. Nevertheless, we wish to make it abundantly clear that we vacate both orders of the district court.
 
 
 27
 The case is remanded to the district court with instructions to vacate its judgment and earlier orders, and to dismiss the complaint.
 
 
 28
 JOHN R. BROWN, Senior Circuit Judge, concurring in part and dissenting in part.
 
 
 29
 I concur in the opinion of the court with respect to the holding that the district court for the District of North Dakota (Conmy, J.) should have abstained under Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). See also, Alleghany Corp. v. McCartney, 896 F.2d 1138 (8th Cir.1990) (Decided simultaneously with this case). I also agree with the court that "the district court opinion in this case, which was published, is infected with serious error." Alleghany Corp. v. Pomeroy, See p. 1319. (8th Cir.1990).
 
 
 30
 I dissent from the court's failure to address and determine the merits of the commerce clause claim and "to make it abundantly clear that our actions not only deprive that opinion of any precedential value, but also foreclose claims that it has persuasive weight." Id. at 1319.
 
 The Framework
 
 31
 The Commerce Clause provides that "Congress shall have Power ... To regulate Commerce ... among the several States." U.S. Const. Art. I, Sec. 8, cl. 3. It acts as an implied limit on the power of the States to burden interstate commerce (the "dormant" Commerce Clause), although Congress may authorize the states to do so and any action taken within the scope of that authority is invulnerable to Commerce Clause challenge. Western & Southern Life Ins. Co. v. State Board of Equalization of California, 451 U.S. 648, 653, 101 S.Ct. 2070, 2075, 68 L.Ed.2d 514, 520 (1981); see also Northeast Bancorp, Inc. v. Board of Governors, 472 U.S. 159, 174, 105 S.Ct. 2545, 2553, 86 L.Ed.2d 112, 125 (1985).
 
 
 32
 Historically, insurance was not considered "commerce" for Commerce Clause purposes. See Paul v. Virginia, 8 Wall. 168, 19 L.Ed. 357, 361 (1869). However, that all came to an almost calamitous end in United States v. South-Eastern Underwriters' Assoc., 322 U.S. 533, 553, 64 S.Ct. 1162, 1173, 88 L.Ed. 1440, 1457 (1944). The Supreme Court held that insurance was subject to the Commerce Clause. Congress acted quickly in response to this case by passing the McCarran-Ferguson Act, 15 U.S.C. Secs. 1011, 1012 (West 1976). It provides, in relevant part:
 
 
 33
 [Sec. 1][1] Declaration of Policy. Congress declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States.
 
 
 34
 [Sec. 2] (a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.
 
 
 35
 (b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance....
 
 
 36
 In effect, the Act protects state regulation and taxation of the "business of insurance" from Commerce Clause attack.
 
 
 37
 The Constitutional question to be answered here is whether North Dakota Century Code Sec. 26.1-10-03(1)[2] (hereafter the North Dakota statute), regulating transactions among owners of stock in insurance companies violates the Commerce Clause.
 
 The Wrong Approach
 
 38
 The trial court held that the North Dakota statute did not regulate the "business of insurance" as that phrase is used in the McCarran-Ferguson Act. It looked first to Securities & Exchange Commission v. National Securities, Inc., 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969), and concluded that the statute regulated insurance companies rather than the "business of insurance." The trial court also applied the three-factor analysis set forth in Union Labor Life Ins. Co. v. Pireno, 458 U.S. 119, 129, 102 S.Ct. 3002, 3009, 73 L.Ed.2d 647, 656 (1982), to determine whether the North Dakota statute regulates the "business of insurance" and held that it did not.
 
 
 39
 Having thus found that the North Dakota statute was not invulnerable to Commerce Clause attack, the trial court had to determine whether the statute violated the Commerce Clause. Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174, 178 (1970), held that the Commerce Clause will permit incidental regulations of interstate commerce as long as the burden is not excessive in relation to the local interests served. The trial court looked to Edgar v. MITE Corp., 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982)[3], and determined that this was a direct regulation of interstate commerce, rather than an incidental one, and thus prohibited.
 
 
 40
 I disagree with the trial court's conclusions.
 
 
 41
 Regulating the "Business of Insurance"
 
 
 42
 In reaching its conclusion that the North Dakota statute violated the Commerce Clause, the trial court relied heavily on Securities & Exchange Commission v. National Securities, Inc., 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969), where the Court had stated:
 
 
 43
 The statute [McCarran-Ferguson] did not purport to make the States supreme in regulating all activities of insurance companies; its language refers not to the persons or companies who are subject to state regulation, but to laws "regulating the business of insurance." Insurance companies may do many things which are subject to paramount federal regulation; only when they are engaged in the "business of insurance" does the statute apply.
 
 
 44
 393 U.S. at 459-60, 89 S.Ct. at 569, 21 L.Ed.2d at 676 (emphasis in original).
 
 
 45
 On this authority, the trial court drew a distinction between the "business of insurance," which is protected from Commerce Clause attack by the McCarran-Ferguson Act, and the "business of insurance companies " which is not. It held that the North Dakota statute regulated the "business of insurance companies."
 
 
 46
 In its discussion of the National Securities case, the district court did not go far enough. The paragraph it quoted in part goes on to address more particularly the question at issue.
 
 
 47
 Certainly the fixing of rates is part of this business [of insurance]; that is what South-Eastern Underwriters was all about. The selling and advertising of policies, ... and the licensing of companies and their agents, ... are also within the scope of the statute. Congress was concerned with the type of state regulation that centers around the contract of insurance.... The relationship between insurer and insured, its reliability, interpretation, and enforcement--these were the core of the "business of insurance." Undoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that they too must be placed in the same class. But whatever the exact scope of the statutory term, it is clear where the focus was--it was on the relationship between the insurance company and the policyholder. Statutes aimed at protecting or regulating this relationship, directly or indirectly, are laws regulating the "business of insurance."
 
 
 48
 National Securities, 393 U.S. at 459-60, 89 S.Ct. at 568-69, 21 L.Ed.2d at 676 (citations omitted). Had the trial court used this more expansive version of the National Securities test, it would have been compelled to find that the North Dakota statute does regulate the business of insurance.
 
 
 49
 National Securities itself points to this result. The state's approval of the merger at issue in that case had been given pursuant to two Arizona statutes. The first gave the Arizona Insurance Commissioner the power to determine whether the merger was "equitable to shareholders" of an insurer; the second was part of the Commissioner's general licensing authority and required him to determine that the merger would not "substantially reduce the security of and service to be rendered to policyholders." 393 U.S. at 462, 89 S.Ct. at 569, 21 L.Ed.2d at 677. The first statute was held not to relate to the business of insurance because it focused on the insurance company/shareholder relationship. 393 U.S. at 460, 89 S.Ct. at 568, 21 L.Ed.2d at 676. The second was found to clearly relate to the "business of insurance." 393 U.S. at 462, 89 S.Ct. at 569, 21 L.Ed.2d at 677.
 
 
 50
 The North Dakota statute is analogous to the second Arizona statute in National Securities. It is the equivalent of a licensing statute. The purposes underlying the statute were recognized by Judge Van Sickle of the United States District Court in North Dakota.
 
 
 51
 In the nature of this business, insurance companies tend to be liquid and thus ripe for exploitation to the potential injury of the insureds. The existence of multiple holding companies, as here, can insulate ultimate management from identification and exposure to the insureds who might be victimized by mismanagement. In fact, the Insurance Holding Company Systems Act addresses itself to this very problem.
 
 
 52
 Walden v. Wigen, No. A1-83-117, Slip op. at 6-7 (D.N.D. July 29, 1983). The same sentiment was expressed by Magistrate Groh in his Report and Recommendation on the Wisconsin Commissioner's motion to dismiss.
 
 
 53
 Insurance companies receive large sums of money from the public in exchange for the companies' promise to fulfill the insurance contract when the risk insured against occurs.... It seems elementary that the regulatory authorities will wish to assure themselves that the stewards of those funds are not only trustworthy but are also informed and prudent managers.
 
 
 54
 Alleghany v. Haase, No. 88-C-368-C, Magistrate's Report at 39 (W.D.Wisc. Dec. 12, 1988). Finally, North Dakota Insurance Commissioner Pomeroy's affidavit, adequate for summary judgment purposes, stated that the North Dakota statute serves as a "necessary adjunct to" the licensing regulations.
 
 
 55
 Without the North Dakota statute, those provisions of the North Dakota statutes which govern the initial issuance of a certificate of authority would be fatally undermined because control of a domestic insurer could be transferred without meaningful regulatory oversight to dishonest or unqualified parties--the very sort of persons against whom the certificate of authority provisions are designed to initially protect policyholders.
 
 
 56
 Pomeroy Affidavit at 5 (Aug. 31, 1988).
 
 
 57
 The North Dakota statute is clearly designed primarily to protect policyholders; its effect on the insurance company/shareholder relationship is secondary. This statute authorizes the Commissioner to (1) determine whether the financial condition of a potential acquirer will "prejudice the
 
 
 58
 interests of its policyholders," Sec. 26.1-10-03(4)(c); (2) analyze the plans and proposals of such acquirer to determine if they are "unfair and unreasonable to policyholders," Sec. 26.1-10-03(4)(e); and (3) scrutinize the "competence, experience and integrity" of the acquirer to determine if the acquisition will be "in the interest of policyholders." Sec. 26.1-10-03(4)(f). Thus Commissioner Pomeroy's disapproval of Alleghany's application was based primarily on its potential harm to St. Paul's policyholders, many of whom will be residents, citizens of North Dakota, corporate assureds, and in all likelihood, the state fisc, which would likely have to bear the burden of the insurance company's insolvency.
 
 
 59
 Because the North Dakota statute is so closely analogous to a licensing statute, I am confident it falls within the National Securities description of regulations which do relate to the "business of insurance." But even outside the analogy, the North Dakota statute is clearly among those "other activities of insurance companies [which] relate so closely to their status as reliable insurers that they must be placed in the same class"[4] with other regulations of the "business of insurance."
 
 
 60
 The trial court also applied the three-factor analysis set forth in Union Labor Life Ins. Co. v. Pireno, 458 U.S. 119, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982) to determine whether the North Dakota statute regulates the "business of insurance" and held that it did not.
 
 
 61
 Pireno looks at the following characteristics to determine whether an activity is the "business of insurance" within the meaning of the McCarran-Ferguson Act:[5] "first, whether the practice has the effect of transferring or spreading a policyholder's risk; second, whether the practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entities within the insurance industry." Pireno, 458 U.S. at 129, 102 S.Ct. at 3009, 73 L.Ed.2d at 656.
 
 
 62
 The first factor is met because the North Dakota statute, like a licensing statute, does have the effect of transferring or spreading risk by determining who is capable of assuming policyholders' risks.[6] The focus of the second factor is the "relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement." Pireno, 58 U.S. at 128, 102 S.Ct. at 3008, 73 L.Ed.2d at 655.[7] The North Dakota statute satisfies this criteria because its principal purpose is to ensure that the insurer is capable of fulfilling its obligations to its policyholders. Finally, the third factor is met because the North Dakota statute applies only to acquisitions of control of North Dakota insurance companies or their parents.
 
 
 63
 Thus, under both the National Securities and Pireno tests, the North Dakota statute is one which regulates the "business of insurance."
 
 A Broader Perspective
 
 64
 Even if the North Dakota statute did not regulate "the business of insurance," it would be exempt from Commerce Clause attack. Group Life & Health Ins. Co. v. Royal Drug Co., 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979), addressed the question of what constitutes the "business of insurance" under the McCarran-Ferguson Act. The specific issue in that case was the scope of the antitrust exemption contained in Sec. 2(b) of the Act. However, to reach its result, the Court analyzed and distinguished the meaning of the phrase "the business of insurance" under the two sections of the Act.
 
 
 65
 The primary concern of Congress ... was in enacting legislation that would ensure that the States would continue to have the ability to tax and regulate the business of insurance. This concern is reflected in Secs. 1 and 2(a) of the Act.... [Congress'] secondary concern was the applicability of the antitrust laws to the insurance industry.
 
 
 66
 * * * * * *
 
 
 67
 There is no question that the primary purpose of the McCarran-Ferguson Act was to preserve state regulation of the activities of insurance companies.... The McCarran-Ferguson Act operates to assure that the States are free to regulate insurance companies without fear of Commerce Clause attack.
 
 
 68
 The repeated insistence in the dissenting opinion that the McCarran-Ferguson Act should be read as protecting the right of the States to regulate what they traditionally regulated is thus entirely correct--and entirely irrelevant to the issue now before the Court.... For the question here is not whether the McCarran-Ferguson Act made state regulation of these Pharmacy Agreements exempt from attack under the Commerce Clause. It is the quite different question whether the Pharmacy Agreements are exempt from the antitrust laws.
 
 
 69
 In short, the McCarran-Ferguson Act freed the States to continue to regulate and tax the business of insurance companies, in spite of the Commerce Clause. It did not, however, exempt the business of insurance companies from the antitrust laws. It exempted only "the business of insurance."
 
 
 70
 440 U.S. at 217-18 and 218-19 n. 18, 99 S.Ct. at 1076-77 and 1077 n. 18, 59 L.Ed.2d at 272 and 272-73 n. 18 (emphasis added in part).
 
 
 71
 This view that regulation of the insurance industry is exempt from Commerce Clause attack has been supported by even more recent Supreme Court pronouncements.
 
 
 72
 Congress removed all Commerce Clause limitations on the authority of the States to regulate and tax the business of insurance when it passed the McCarran-Ferguson Act.... The unequivocal language of the Act suggests no exceptions.
 
 
 73
 Western & Southern Life Ins. Co. v. State Board of Equalization, 451 U.S. 648, 653, 101 S.Ct. 2070, 2075, 68 L.Ed.2d 514, 520-21 (1981); see also Western & Southern, 451 U.S. at 655, 101 S.Ct. at 2076, 68 L.Ed.2d at 522 ("[T]he McCarran-Ferguson Act 'left the matter of regulation ... of insurance companies to the states.' ") (citation omitted); Metropolitan Life Ins. Co. v. Ward, 470 U.S. 869, 880, 105 S.Ct. 1676, 1683, 84 L.Ed.2d 751, 761 (1985) ("[T]he McCarran-Ferguson Act exempts the insurance industry from Commerce Clause restrictions....").
 
 
 74
 Based on these cases, I hold--and regret that my distinguished colleagues are hesitant to join me, not because they differ, but because they feel reluctant to address the problem in view of our unanimous conclusion that the trial judge ought to have abstained--that the North Dakota statute was exempt from Commerce Clause attack as a state regulation of the insurance industry.
 
 Williams Act Pre-emption
 
 75
 In addition to its Commerce Clause claims, Alleghany asserts that the North Dakota statute is pre-empted by Sec. 13(d) of the Williams Act, 15 U.S.C. Sec. 78m(d)(1).[8]
 
 
 76
 In deciding a pre-emption question,
 
 
 77
 [A]ppellees must overcome the presumption against finding pre-emption of state law in areas traditionally regulated by the States.... When Congress legislates in a field traditionally occupied by the States, "we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."
 
 
 78
 California v. ARC America Corp., 490 U.S. ----, ----, 109 S.Ct. 1661, 1665, 104 L.Ed.2d 86, 94 (1989) (citations omitted). Alleghany fails to meet this burden because (i) the North Dakota statute is protected from pre-emption by the McCarran-Ferguson Act, and (ii) Sec. 13(d) of the Williams Act does not clearly "manifest [a] purpose" to supersede the traditional power of the states to regulate insurance.
 
 
 79
 The McCarran-Ferguson Act provides, in Sec. 2(b), that acts of Congress are not to be construed as impairing or superseding state laws regulating insurance unless the "Act specifically relates to the business of insurance." Section 13(d) of the Williams Act does not.
 
 
 80
 The Williams Act was amended in 1970 to cover equity securities issued by insurance companies along with all of the other securities it covers. As Congress has since acknowledged,
 
 
 81
 nothing contained in the Williams Act or the rules and regulations thereunder invalidates, impairs, or supersedes current state insurance holding company laws--including notice, hearing and precommencement approval provisions--which provide, for the protection of policyholders, a comprehensive scheme of state regulation over the acquisition of control of the insurance companies. These laws are protected from Federal preemption by the McCarran-Ferguson Act.[9]
 
 
 82
 Section 13(d) does not "specifically relate" to the business of insurance merely because it refers to it. The amendment which added this reference was made to cover transactions in insurance company securities which had previously been exempted from Williams Act coverage. The Williams Act primarily deals with securities transactions. It does not "specifically relate to" the business of insurance within the meaning of the McCarran-Ferguson Act merely because it covers transactions in the securities of insurance companies.
 
 
 83
 Even if the North Dakota statute was not protected by the McCarran-Ferguson Act against pre-emption by the Williams Act, there would still be no Williams Act pre-emption. This is a situation where both the North Dakota statute and the Williams Act may be complied with simultaneously (as Alleghany has proved by doing so). It is only where compliance with both the state and the Federal law is impossible or where the state law stands as an obstacle to compliance with the objectives of Congress that pre-emption occurs. CTS v. Dynamics Corp. of America, 481 U.S. 69, 78-79, 107 S.Ct. 1637, 1647, 95 L.Ed.2d 67, 78 (1987). The North Dakota statute does not prevent disclosure of the ownership of 5% or more of the equity securities in an insurance company and does not require any disclosure prior to the time the Williams Act does. In fact, the North Dakota statute does not come into play at all until the acquirer wishes to obtain more than 10%.
 
 
 84
 Furthermore, the Williams Act does not address the substantive concerns covered by traditional state regulation of insurance. In its role of protecting shareholders in takeover and tender offer situations, the Williams Act does not in any way seek to protect insurance policyholders in the way the North Dakota statute does. A finding of pre-emption would thus result in a lack of any statutory protection of policyholders' interests.
 
 
 85
 In sum, I am positive the North Dakota statute is protected from pre-emption by the Williams Act by operation of the McCarran-Ferguson Act. However, even if it was not, there would be no pre-emption because the statute and the Act are compatible and overlap only in limited respects.
 
 Wrap Up
 
 86
 Thus, I concur in the court's opinion that the trial court should have abstained.
 
 
 87
 I dissent with vigor from the failure of the Court to address the decisive questions which would put an end to this case, at least in North Dakota. The attack by Alleghany was directed and pungent: McCarran-Ferguson could not save the day from Commerce Clause attack. The trial judge followed this erroneous path. The issue was the primary subject of the briefs and almost the whole of an extended oral argument by counsel of excellent advocacy. The result was wrong. The result was directly attacked on the appeal.
 
 
 88
 Now the Court, for conscientiously held, but still erroneous views, declines to decide.
 
 
 89
 I must respectfully dissent.
 
 
 
 *
 The HONORABLE JOHN R. BROWN, Senior Circuit Judge for the United States Court of Appeals for the Fifth Circuit, sitting by designation
 
 
 [1]
 The appellants also argue that abstention was proper under the doctrine of Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). Because we hold that Younger abstention is proper, we need not consider the Burford argument
 
 
 [2]
 The subsidiaries are organized under the laws of California, Delaware, Indiana, Nebraska, New York, North Dakota, Texas, and Wisconsin
 
 
 [3]
 As we described in Alleghany v. McCartney, 896 F.2d 1140 (8th Cir.), Minnesota and three other states approved Alleghany's applications, while four states denied the applications
 
 
 [4]
 The Commissioner also found that a transfer of control would not have been in the interest of St. Paul security holders. Commissioner of Insurance Decision at 49
 
 
 [5]
 For Younger purposes, McCartney is essentially indistinguishable from this case. One difference between the cases is that the federal action in McCartney was filed within the time for filing a state action, but this case was brought after the deadline for filing a state action had passed. This distinction does not call for a different result. In McCartney, we held that:
 [T]his decision is guided by the Supreme Court's pronouncements refining the doctrine which originated in Younger v. Harris. The Court has held that Younger abstention applies to state administrative proceedings, see, e.g., Middlesex, and that appellate processes must be exhausted before a party such as Alleghany can seek relief in federal court, see Huffman. In Dayton Christian Schools, the Court held that it is sufficient under Middlesex that constitutional claims can be raised in state judicial review of the administrative proceedings. These decisions lead to the conclusion that abstention under Younger is appropriate on the facts of this case.
 McCartney, 896 F.2d at 1145.
 
 
 [6]
 Two Justices in NOPSI disagreed with this interpretation of Supreme Court precedent. According to Chief Justice Rehnquist:
 Nothing in [NOPSI ] curtails our prior application of Younger to certain administrative proceedings which are "judicial in nature," see [Dayton Christian Schools, 477 U.S. 619, 106 S.Ct. 2718; Middlesex, 457 U.S. 423, 102 S.Ct. 2515]; nor does it alter our prior case law indicating that such proceedings should be regarded as "ongoing" for the purposes of Younger abstention until state appellate review is completed, see Dayton Christian Schools, supra, 477 U.S., at 629, 106 S.Ct., at 2724.
 NOPSI, 109 S.Ct. at 2521. (Rehnquist, C.J., concurring). Justice Blackmun also indicated his belief that prior decisions had decided the question. See id. (Blackmun, J., concurring).
 
 
 [1]
 The bracketed section numbers indicate the McCarran-Ferguson Act section designations. They are included here for ease of reference. The United States Code, Title 15, numbers these sections 1011 and 1012, respectively
 
 
 [2]
 26.1-10-03. Acquisition of control of or merger with domestic company--Filing requirements--Hearings--Exceptions--Violations--Jurisdiction--Consent to Service of Process
 
 
 [1]
 A person other than the issuer may not make a tender offer for or a request or invitation for tenders of, or enter into any agreement to exchange securities for, seek to acquire, or acquire, in the open market or otherwise, any voting security of a domestic insurance company if, after consummation, the person would, directly or indirectly, or by conversion or by exercise of any right to acquire, be in control of the company, and a person may not enter into an agreement to merge with or otherwise to acquire control of a domestic insurance company, unless, at the time the offer, request, or invitation is made or the agreement is entered into, or prior to the acquisition of the securities if no offer or agreement is involved, the person has filed with the commissioner and has sent to the company, and the company has sent to its shareholders, a statement containing the information required by this section and the offer, request, invitation, agreement, or acquisition has been approved by the commissioner in the manner hereinafter prescribed. For purposes of this section, a domestic insurance company includes any other person in control of a domestic insurance company unless the other person is either directly or through its affiliates primarily engaged in business other than the business of insurance
 
 
 [3]
 The MITE Court held that:
 "[A] state statute which by its necessary operation directly interferes with or burdens [interstate] commerce is a prohibited regulation and invalid, regardless of the purpose with which it was enacted." ... The Commerce Clause also precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State.... "[A]ny attempt 'directly' to assert extraterritorial jurisdiction over persons or property would offend sister States and exceed the inherent limits of the State's power."
 457 U.S. at 642-43, 102 S.Ct. at 2641, 73 L.Ed.2d at 283 (citations omitted).
 
 
 [4]
 National Securities, 393 U.S. at 460, 89 S.Ct. at 568, 21 L.Ed.2d at 676
 
 
 [5]
 Pireno arose as an antitrust action and examined the question of what constitutes "the business of insurance" under Sec. 2(b) of the McCarran-Ferguson Act. As an exemption from the antitrust laws, this section of the statute is construed narrowly. 458 U.S. at 126, 102 S.Ct. at 3007, 73 L.Ed.2d at 654. Although the cause of action I deal with arises under the Commerce Clause and thus implicates a different section of the Act, I need not address the broader scope which the phrase "the business of insurance" might have under Sec. 2(a) of the Act. I find that the North Dakota statute regulates the "business of insurance" even under Pireno's restrictive test
 
 
 [6]
 In fact, Commissioner Pomeroy specifically found that the proposed "acquisition was not in the best interest of the public nor in the interest of the policyholders." Alleghany v. Pomeroy, 700 F.Supp. 460 (D.N.D.1988)
 
 
 [7]
 Quoting, Group Life & Health Insurance v. Royal Drug Co., 440 U.S. 205, 215-16, 99 S.Ct. 1067, 1075, 59 L.Ed.2d 261, 671 (1979), quoting, in turn, SEC v. National Securities, Inc., 393 U.S. 453, 460, 89 S.Ct. 564, 568, 21 L.Ed.2d 668, 676 (1969)
 
 
 [8]
 15 U.S.C. Sec. 78m(d)(1) (West 1981) provides, in pertinent part:
 Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is registered pursuant to section 78l of this title, or any equity security of an insurance company which would have been required to be so registered except for the exemption contained in section 78l (g)(2)(G) ... is directly or indirectly the beneficial owner of more than 5 per centum of such class shall, within 10 days after such acquisition, send to the issuer of the security ... and file with the Commissioner, a statement containing such of the following information, and such additional information, as the Commission may by rules and regulations, prescribe as necessary or appropriate in the public interest or for the protection of investors--....
 
 
 [9]
 Reports of the Senate Committee on Banking, Housing and Urban Affairs on the Tender Offer Disclosure and Fairness Act of 1987, S.Rep. No. 100-265, 100th Cong., 1st Sess. 53 (1987)