TYMKOVICH, Circuit Judge,
dissenting.
By filing a claim under 42 U.S.C. § 1983 in federal court, Dena Brown circumvented ongoing and coercive administrative proceedings in the State of Kansas. Dissatisfied with the outcome of the administrative process at the agency level, she could have sought judicial review in Kansas state courts. Instead, Brown chose to abandon Kansas administrative process altogether, co-opting the federal court in her undertaking. Younger abstention exists to ensure federal courts respect their state counterparts by abstaining in deference to ongoing state judicial proceedings. See Younger v. Harris, 401 U.S. 37, 44, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) (“[T]he National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States.”). The doctrine applies here, and the district court properly abstained from adjudicating Brown’s lawsuit. We should therefore affirm.
The majority instead reverses the district court’s abstention. Because I disagree with (1) the majority’s conclusion that the proceedings in question were remedial rather than coercive, and (2) its failure to continue and find that Brown’s judicial proceeding was ongoing, I respectfully dissent. Once Brown started down the path of administrative relief, Younger abstention prevents us from letting her detour into federal court in these circumstances.
1. The Coercive-Remedial Distinction
The majority errs in holding that Brown’s administrative proceedings were remedial rather than coercive. As I understand the distinction, these proceed *895 ings — properly characterized as aimed at enforcing state Medicaid laws against Brown — were coercive.
Our court has yet to address the coercive-remedial distinction in applying Younger to administrative proceedings. Does the distinction even apply?
The Supreme Court mentioned the distinction for the first and only time in a footnote in Ohio Civil Rights Commission v. Dayton Christian Schools, Inc., 477 U.S. 619, 627 n. 2, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986) {Dayton). There, the Court sought to reconcile the “application of the Younger principle to pending state administrative proceedings” with Patsy v. Florida Board of Regents, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982), “which holds that litigants need not exhaust their administrative remedies prior to bringing a § 1983 suit in federal court.” Dayton, 477 U.S. at 627 n. 2, 106 S.Ct. 2718. The Court noted that, “[u]nlike Patsy, the administrative proceedings here are coercive rather than remedial, began before any substantial advancement in the federal action took place, and involve an important state interest.” Id. (emphasis added).
The Court did not say what it meant by “coercive” and “remedial.” Patsy dealt with a state’s denial of employment opportunities to a teacher, 457 U.S. at 498, 102 S.Ct. 2557, while Dayton dealt with a state’s civil rights commission seeking to enforce state laws against a school district’s decision to fire a teacher, 477 U.S. at 621-22, 106 S.Ct. 2718. In other words, only in Dayton was the government enforcing state laws. In Patsy, the state merely acted as an employer choosing not to do something, in this case promote an employee.
The Dayton Court did not specifically say that Younger could apply only to coercive administrative proceedings, and the very distinction has been criticized. See, e.g., Harry T. Edwards, The Changing Notion of “Our Federalism,” 33 Wayne L.Rev. 1015, 1029 n. 42 (1987) (“I find the Court’s distinction between ‘coercive’ and ‘remedial’ administrative proceedings to be unpersuasive. If anything, the purposes behind § 1983 argue more strongly for allowing the federal plaintiff to avail herself of the federal forum in ‘coercive’ cases.” (citation omitted)).
The Supreme Court nonetheless must have thought the distinction important, because otherwise no need for differentiating between coercive and remedial proceedings exists. The Court could have simply reasoned that because a federal plaintiff in Dayton had already initiated state administrative proceedings, the non-exhaustion principle of Patsy and Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), did not apply. See Huffman v. Pursue, Ltd., 420 U.S. 592, 609 n. 21, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975) (making this very point). But the Court went further and distinguished Patsy along the coercive-remedial criterion. The distinction thus carries some meaning, and we, like several other circuits have done, must flesh it out. See Laurel Sand & Gravel, Inc. v. Wilson, 519 F.3d 156, 166 (4th Cir.2008); Stroman Realty, Inc. v. Martinez, 505 F.3d 658, 662 (7th Cir.2007) (citing Majors v. Engelbrecht, 149 F.3d 709, 712 (7th Cir.1998)); Planned Parenthood of Greater Iowa, Inc. v. Atchison, 126 F.3d 1042, 1047 (8th Cir.1997); O’Neill v. City of Philadelphia, 32 F.3d 785, 791 n. 13 (3d Cir.1994); Kercado-Melendez v. Aponte-Roque, 829 F.2d 255, 260 (1st Cir.1987).

a. Standard for Adjudicating the Coercive-Remedial Distinction

While I agree with the majority that the distinction must be addressed, I disagree with the articulated standard.
*896 The Supreme Court’s failure to explain what types of proceedings are coercive and what types are remedial produced a circuit split on the issue. On the one hand, the First Circuit looks to who initiated the administrative process. If it was the federal plaintiff, then the proceedings are remedial; if the state, coercive. Kercado-Melendez, 829 F.2d at 260 (explaining Patsy and Dayton along the lines of who initiates the administrative proceedings). The majority finds this approach attractive.
The Third, Fourth, and Seventh Circuits, on the other hand, all focus on the underlying nature and substance of the administrative proceedings, asking whether the proceedings can be characterized as state enforcement proceedings. If they can, they are coercive, which is to say “judicial in nature”; if not, remedial. Majors, 149 F.3d at 712 (“For purposes of Younger abstention, administrative proceedings are ‘judicial in nature’ when they are coercive — i.e., state enforcement proceedings .... ”); see also Laurel, 519 F.3d at 166 (tying together the terms “coercive” and “judicial in nature”); O’Neill, 32 F.3d at 791 n. 13 (explaining the coercive nature of the proceedings in Dayton as marked by the state’s motivation “to enforce a violation of state law”).
The district court below found the wiser approach to be one that looks to the underlying nature and substance of the proceedings rather than to the initiating party. Brown v. Day, 477 F.Supp.2d 1110, 1116 (D.Kan.2007). I agree. First, the Supreme Court in Dayton likely employed the coercive-remedial distinction to limit the extension of Younger to those administrative proceedings — and only those administrative proceedings — that are most like Younger itself, which was a criminal case. See Moore v. City of Asheville, N.C., 396 F.3d 385, 393 (4th Cir. 2005) (explaining similarly the Court’s extension of Younger only to coercive civil proceedings in Huffman, “mindful that the doctrine was originally applied to protect the state interests represented in criminal prosecutions”); Patrick J. Smith, Note, The Preemption Dimension of Abstention, 89 Colum. L.Rev. 310, 326-27 (1989) (recognizing the interrelationship between the enforcement nature of state proceedings and the importance of such proceedings to the state). By making the distinction turn on the underlying nature and substance of the administrative proceedings, we can ensure Younger abstention applies only to proceedings — like criminal prosecutions — of paramount importance to the state. The approach that looks to who initiates state administrative process, on the other hand, does not have this advantage.
Second, focusing primarily on who initiates administrative process fails to recognize that the labels “remedial” and “coercive” can simply be opposite sides of the same coin. If a federal plaintiff initiates a state administrative process, the First Circuit’s approach in Kercado-Melendez would call that process remedial. But that federal plaintiff surely felt coerced by the challenged state action he or she is now seeking to remedy. On the flip side, if the government initiates administrative process against a would-be federal plaintiff, Kercado-Melendez would label that process coercive. But that would-be federal plaintiff, forced into the state-initiated administrative proceedings, can also be described as attempting to remedy governmental coercion through the administrative hearing. Kercado-Melendez’s interpretation of the coercive-remedial distinction, while easy to apply, does not explain why it modifies the Younger abstention doctrine.
*897 The question we must therefore ask is whether administrative proceedings represent state enforcement efforts — regardless of who initiates them. As a leading treatise on federal court jurisdiction suggests, the inquiry is aimed at determining who is “effectively the ‘plaintiff or the ‘defendant’ before the agency — that is, whether the administrative proceeding was an enforcement action.” Richard H. Fallon, Jr. et ah, Hart and Wechsler’s The Federal Courts and The Federal System 1257 (5th ed.2003) (emphasis added). The majority’s approach, instead aligned with Kercado-Melendez, misses the point.

b. Brown’s Proceedings Were Coercive

Considering the underlying substance and nature of Brown’s administrative proceedings, I agree with the district court that the proceedings represented Kansas’s efforts at enforcing state Medicaid law against Brown. In the words the majority uses to describe coercive proceedings, Kansas here was seeking the “proactive enforcement of its laws.” Majority Op. at 892.
As the district court correctly summarized, “[ujnder Kansas law, the termination of benefits to ineligible recipients is an enforcement mechanism designed to address violations of state Medicaid law.” Brown, 477 F.Supp.2d at 1117. Kansas “has joined the federal government and other states in guarding against providing healthcare for individuals who have their own resources.” Id. (quoting Miller v. Dep’t of Soc. & Rehab. Servs., 275 Kan. 349, 64 P.3d 395, 399 (Kan.2003)).
Several statutory provisions reinforce this conclusion. Benefit recipients have a duty under Kansas law to report changes in eligibility. Kan. Stat. Ann. § 39-719b (describing “the duty of the recipient to notify the secretary immediately,” and the benefits paid in violation of that duty as “recoverable by the secretary as a debt due to the state” (emphasis added)). Benefits received in violation of that duty are described as “assistance ... unlawfully received.” Id. § 39-719c. And if failure to report amounts to fraud, the recipient “shall be guilty of the crime of theft ... and he shall be required to remit ... the amount of any assistance given him under such fraudulent act.” Id. § 39-720. From the perspective of the State of Kansas, then, Brown was an unlawful recipient of Medicaid benefits, and the state was acting in its enforcement role during Brown’s administrative proceedings.
That Brown was the one to initiate an administrative hearing to challenge termination of her benefits does not matter. Under Supreme Court precedent, termination of welfare benefits “involves state action that adjudicates important rights” and triggers procedural due process rights, such as the right to a hearing. Goldberg v. Kelly, 397 U.S. 254, 262, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). Accordingly, by terminating Brown’s benefits, the state effectively triggered the resultant administrative hearing, which it was required to provide. When Brown took advantage of that hearing, she was no more a “plaintiff’ than was the person who used the available administrative process to challenge parking tickets in O’Neill, 32 F.3d at 787-88. Like the administrative process in O’Neill, Brown’s administrative proceedings were thus coercive. And the end result of the relief sought by Brown was equal to the injunction sought in Moore, 396 F.3d 385 — -an order preventing Kansas from enforcing its Medicaid laws, which is nothing other than injunctive-type relief. Brown’s preemptive federal court action against Kansas functions no differently than if Kansas had initiated cease- and-desist proceedings against her, which Brown then sought to stop.
*898 Nor do I agree with the majority’s “third factor” that argues coercive proceedings exist only where a state initiates an administrative proceeding to punish a federal plaintiff for a “bad act.” The majority cites examples of bad acts from other coercion cases, including a trainer illegally giving performance-enhancing drugs to his horses, and a mining company running a well dry in violation of a state’s environmental statutes. But calling something a “bad act” is simply another way of saying it “violates state law.” And, as explained above, violating the law is precisely what Brown was doing when she was receiving Medicaid benefits to which she was not entitled under Kansas law. An element of subjective moral culpability seems unimportant to this inquiry. The majority’s third factor thus weighs in favor of finding the proceedings here were coercive in nature.
Finally, the majority’s variation of this argument also fails to persuade — namely, that Brown’s proceedings cannot be considered coercive unless the State of Kansas, in addition to terminating benefits prospectively, was actually seeking (instead of just threatening) to recoup benefits received in violation of state law. But Kansas’s important interest in ensuring that only the truly needy receive Medicaid assistance does not become any less important when Kansas uses something less than its full arsenal of enforcement measures to pursue an unlawful recipient. Moreover, it would be harmful policy, and one unjustified by Younger abstention principles, to require states in every case to use the most coercive measures in enforcing their laws just so they can preserve abstention arguments.
Because Kansas’s role in the hearing was to enforce Medicaid laws against an unlawful benefits recipient, the proceedings were coercive.
2. The Ongoing Proceeding Prong
In light of its determination that the proceedings here were remedial, the majority does not address whether Brown’s state judicial process was ongoing when she filed her federal complaint. Because in my view the proceedings were coercive, making a proper Younger abstention determination requires that we also address whether the proceedings were ongoing. And, in this instance, the proceedings were indeed ongoing.
After reviewing the briefs and oral argument in this case, one can discern two well-reasoned (but ultimately unpersuasive) arguments that would support the opposite conclusion — namely, that the proceedings were not ongoing. Recall that here, the Kansas Health Policy Authority (HPA)[1] issued a final order, and Brown chose not to seek judicial review of that order in Kansas state courts. The first argument is that the issuance of an agency final order represents a point where the state process temporarily ceases to be ongoing, and the litigant can choose either to continue in the state system or shift forum by filing a lawsuit in federal court. The second argument is that because Brown did not raise her federal issue in a hearing before the HPA, any state-court review of that issue would have been de novo. The process cannot be ongoing, this second argument goes, if subsequent review is de novo.
Neither of these reasons flows from the Supreme Court’s explanation of Younger abstention. Nor does either comport with the clear weight of authority from other circuits — indeed, the reasons are plainly *899 contradicted by that authority. I would therefore conclude Brown’s state proceedings were ongoing when she filed the federal complaint.

a. The Ongoing Proceeding Prong and Right of Judicial Review in State Courts

Neither the Supreme Court nor our circuit has yet addressed the exact issue of whether an administrative proceeding should be considered ongoing after an administrative agency issues a final order that is appealable, but not yet appealed, to state courts. But the Supreme Court’s treatment of Younger abstention in the context of civil cases, although not administrative cases, at least strongly suggests that such administrative proceedings should be considered ongoing. Younger applies with equal force to criminal, civil, and administrative proceedings. See Amanatullah v. Colo. Bd. of Med. Exam’rs, 187 F.3d 1160, 1163 (10th Cir.1999) (explaining that Younger abstention is proper when “there is an ongoing state criminal, civil, or administrative proceeding”). The Supreme Court’s explanation of the doctrine in the context of civil proceedings should thus be followed in the administrative context, unless good reasons exist for treating Younger abstention in these two contexts differently.
For Younger abstention in the context of state civil proceedings, the Supreme Court unambiguously stated that a natural break between trial and appellate stages of a proceeding does not destroy its ongoing nature. Huffman, 420 U.S. at 608, 95 S.Ct. 1200. In Huffman, a civil nuisance lawsuit was brought in Ohio state court to close a movie theater screening pornographic films. Id. at 598, 95 S.Ct. 1200. The movie theater lost the case in trial court but, instead of appealing the judgment within the state court system, filed a § 1983 lawsuit challenging Ohio’s public nuisance statute as a violation of the First Amendment and requested declaratory and injunctive relief. Id. A three-judge panel of the federal district court reached the merits and agreed with the movie theater.
The Supreme Court reversed, holding unequivocally that a party seeking relief in a federal court “must [first] exhaust his state appellate remedies.” Id. at 608, 95 S.Ct. 1200. For the purposes of Younger abstention, then, trial and appellate stages of state court litigation should be treated as one continuous process that a litigant cannot truncate by filing a federal action halfway through state proceedings. Otherwise, “all of the evils at which Younger is directed would inhere in federal intervention prior to completion of state appellate proceedings, just as surely as they would if such intervention occurred at or before trial.” Id.
The Court identified three such evils. First, “[ijntervention at the later stage is if anything more highly duplicative, since an entire trial has already taken place.” Id. Whether or not state courts have had a chance to address the federal issue raised in subsequent federal litigation, the possible duplication of proceedings is a valid concern. The parties have already once assembled for a full trial in the state system. A second trial in federal court, even if it raises new issues, is sure to overlap to a significant extent with state proceedings.
Second, the Court in Huffman drew on YoungeYs central theme: comity between federal and state courts. The Court explained a federal court’s “[ijntervention ... [represents] a direct aspersion on the capabilities and good faith of state appellate courts.” Id. When a federal court steps into the middle of the state judicial process after trial but before appeal, “it is likely to be even more disruptive and of *900 fensive because the State has already won” below. Id. at 608-09, 95 S.Ct. 1200. By prohibiting litigants from sidestepping state appellate process, the result in Huffman promotes Younger’s central goal.
Third, “[federal post-trial intervention, in a fashion designed to annul the results of a state trial, also deprives the States of a function which quite legitimately is left to them, that of overseeing trial court dispositions of [federal] issues which arise in civil litigation over which they have jurisdiction.” Id. at 609, 95 S.Ct. 1200. Federal law is supreme in our constitutional design, and state judges are bound to enforce it. U.S. Const, art. VI, cl. 2 (“This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.”); Testa v. Katt, 330 U.S. 386, 393, 67 S.Ct. 810, 91 L.Ed. 967 (1947) (holding that state courts with jurisdiction to hear federal issues “are not free to refuse enforcement” of litigants’ rights under federal law). The Huffman Court pointedly refused “to base a rule on the assumption that state judges will not be faithful to their constitutional responsibilities.” 420 U.S. at 611, 95 S.Ct. 1200.
To protect against Younger’s three evils, the Court effectively introduced a new requirement into the Younger line of cases, “the exhaustion of state appellate remedies.” Owen M. Fiss, Dombrowski, 86 Yale L.J. 1103,1139 (1977). A litigant who has initiated state judicial proceedings must therefore exhaust any available state appellate remedies before filing a related federal action.[2] These remedies must be actively pursued, for the litigant “may not avoid the standards of Younger by simply failing to comply with the procedures of perfecting its appeal within the [state] judicial system.” Huffman, 420 U.S. at 611, 95 S.Ct. 1200 n.22.
After Huffman, at least regarding state civil trials, “a necessary concomitant of Younger” is that state trial and appellate stages are to be viewed as one ongoing judicial process. Id. at 608, 95 S.Ct. 1200. Brown’s case is admittedly different in that rather than dealing with state civil trial, it concerns state administrative proceedings, appealable upon their conclusion to state courts. The Supreme Court expressly left open the question whether the rationale in Huffman would apply to cases where a § 1983 claimant seeks federal court intervention after completion of the administrative hearing but before state court review of the agency’s final order. *901 See New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans, 491 U.S. 350, 369 & n. 4, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989) (NOPSI) (assuming, without deciding, “that the litigation, from agency through courts, is to be viewed as a unitary process that should not be disrupted, so that federal intervention is no more permitted at the conclusion of the administrative stage than during it”).
Notably, one of the concurring opinions in NOPSI raised the possibility that the rationale of Huffman, as applied to administrative agency proceedings, might no longer be an open question. Id. at 374-75, 109 S.Ct. 2506 (Blackmun, J., concurring in the judgment). Because the Court since Huffman has extended Younger into administrative proceedings that are judicial in nature, see Dayton, 477 U.S. at 627, 106 S.Ct. 2718; Amanatullah, 187 F.3d at 1163, the “question whether abstention must continue through the judicial review process” may no longer exist. NOPSI, 491 U.S. at 375, 109 S.Ct. 2506 (Blackmun, J., concurring in the judgment). The concurrence clearly suggested the question was no longer open.
I agree with this assessment of the Younger doctrine. In light of the Court’s extension of Younger to state administrative proceedings, there is no principled reason for not applying Huffman to these proceedings, which are also judicial in nature, and treating them as ongoing through the completion of available state court judicial review. For a federal court to intervene before a state court has had a chance to review and possibly correct the challenged administrative order would give rise to the same concerns Huffman identified. The intervention would (1) result in some duplicative proceedings, (2) undermine state courts’ capability of reviewing the challenged administrative decision’s compliance with federal law, and (3) deprive state courts of their legitimate power of judicial review. These concerns are no less meaningful in the administrative context than they are with respect to civil proceedings.
A majority of other circuits agree. Of the six circuit courts to address this issue, all but one apply the Huffman rationale to administrative proceedings, demanding a party exhaust available state court judicial review before filing a lawsuit in federal court. See Laurel, 519 F.3d at 166 (relying on Huffman to explain that a would-be federal court litigant “must exhaust his state administrative and judicial remedies and may not bypass them in favor of [a] federal court proceeding in which he seeks effectively to annul the results of a state administrative body” (quotation marks omitted)); Maymo-Melendez v. Alvarez-Ramirez, 364 F.3d 27, 35 (1st Cir.2004) (noting that after Huffman, “Younger now has to be read as treating the state process — where the administrative proceeding is judicial in character — as a continuum from start to finish. There ... cannot at any point on the continuum be an automatic right to detour into federal court because unhappy [sic] with an initial answer.”); Majors, 149 F.3d at 713 & n. 3; O’Neill, 32 F.3d at 790-91 & n. 13; Alleghany Corp. v. McCartney, 896 F.2d 1138, 1143-14 (8th Cir.1990). I would agree with these authorities.
The Fifth Circuit is alone in rejecting the application of Huffman reasoning in the context of administrative proceedings. See Thomas v. Tex. State Bd. of Med. Exam’rs, 807 F.2d 453, 456 (5th Cir.1987). That court said, without an explanation, “The mere availability of state judicial review of state administrative proceedings does not amount to the pendency of state judicial proceedings within the meaning of Huffman.” Id. One has to wonder, though, why not? As explained above and *902 consistent with the other circuits to have addressed this question, once the Supreme Court has extended Younger to state administrative proceedings, no principled reason exists against applying the Huffman reasoning to sequential state appellate proceedings' — especially when, like here, the administrative proceedings themselves were judicial in nature. In Majors, the Seventh Circuit succinctly identified why the Fifth Circuit’s approach should be avoided: “Thomas is unpersuasive because it was based on the distinction between administrative enforcement proceedings and civil enforcement proceedings of the Huffman variety, a distinction that is immaterial.” 149 F.3d at 713 n. 3.
I agree and would not make the doctrine turn on such an immaterial distinction. Accordingly, I believe that declining to apply Huffman to administrative proceedings would be erroneous. Like five of our sister circuits, I would hold that state court judicial review of administrative proceedings represents an integral part of state administrative process — which Younger says cannot be cut off at a midpoint in favor of federal court litigation.

b. Brown’s Proceedings Were Ongoing

The State of Kansas clearly affords an opportunity “for judicial review of [an administrative agency’s] final order.” Kan. Stat. Ann. § 77 — 613(b). In performing its judicial review function, a state court “shall grant relief’ if, among other things, “the agency has erroneously interpreted or applied the law.” Id. § 77 — 621(c)(4). Kansas state courts, therefore, have jurisdiction to review Brown’s federal claims— namely, her challenge to the HPA’s decision as a violation of federal Medicaid law.
For a federal court to intervene before Kansas state courts have had a chance to review the HPA’s final order would cast doubt on the ability of Kansas courts to correct the agency’s alleged violation of federal law. Moreover, the intervention would undermine state courts’ legitimate function of reviewing decisions of Kansas administrative agencies. Finally, the intervention duplicates to some extent the proceedings before the HPA. For all of these reasons, the district court was correct to abstain, and I would affirm that decision.
I recognize that my approach to Younger abstention may leave Brown without a remedy here. The time to appeal her administrative proceedings to Kansas state courts has long since run. But see Brown v. Day, No. 06-2212, 2006 WL 3087111, at *4 n. 7 (D.Kan. Oct.27, 2006) (“Because Kansas law recognizes the unique circumstances doctrine, ... it may be possible for plaintiff to resurrect her state claim.”) (citing In re Appeal of Sumner County, 261 Kan. 307, 930 P.2d 1385, 1388 (Kan.1997)). As the Supreme Court explained, however, a federal litigant “may not avoid the standards of Younger by simply failing to comply with the procedures of perfecting its appeal within the [state] judicial system.” Huffman, 420 U.S. at 611 n. 22, 95 S.Ct. 1200. Brown therefore had the burden to perfect her state appeal before filing this § 1983 action. That she failed to do so should not affect our interpretation of Younger abstention.
c. De Novo Exception
As indicated above, the second major argument against applying Younger here is that, even if Brown had sought judicial review of the HPA’s final order in Kansas state courts, the review would have been de novo since the issue presented could not have been addressed by the agency. Given this posture, the second argument goes, Brown’s proceedings cannot be considered ongoing.
*903 I disagree with both the premise and the conclusion. Regarding the premise, I am not persuaded Brown was prevented from raising her federal claim before the HPA. And as to the conclusion, assuming Brown could not in fact present the federal claim to the HPA, Younger requires nothing more than an opportunity to raise that claim during subsequent judicial review of an administrative decision. The de novo argument does not follow from the Younger abstention doctrine.

Raising Federal Claims Before the HPA

In the first place, we have no idea whether the HPA would have been receptive to Brown’s arguments under federal Medicaid law. And “the burden on this point rests on the federal plaintiff to show that state procedural law barred presentation of its claims.” Pennzoil Co. v. Texaco, Inc., 481 U.S. 1, 14, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987) (quotation marks, brackets, and citation omitted). Brown, however, never raised her federal arguments in the HPA proceedings. In such a situation, the Supreme Court instructs we must assume that Brown could have raised these claims before the HPA — unless unambiguous contrary authority exists. See id. at 15, 107 S.Ct. 1519 (“[WJhen a litigant has not attempted to present his federal claims in related state-court proceedings, a federal court should assume that state procedures will afford an adequate" remedy, in the absence of unambiguous authority to the contrary.”); accord O’Neill, 32 F.3d at 792-93. Thus, we must consult Kansas state law to see whether it unambiguously prevents the HPA from considering federal Medicaid law during benefit termination proceedings.
In my view, Kansas law does not unambiguously prevent benefit recipients like Brown from asserting federal claims in proceedings before the HPA. The relevant jurisdictional statute instructs HPA hearing officers as follows: “The department of social and rehabilitation services shall not have jurisdiction to determine the facial validity of a state or federal statute. An administrative law judge from the office of administrative hearings shall not have jurisdiction to determine the facial validity of an agency rule and regulation.” Kan. Stat. Ann. § 75-3306(h). Brown argues the HPA was thus jurisdictionally prohibited from considering her federal law claims.
But a facial challenge is by no means the only way of raising federal issues. Brown could have presented an as-applied challenge. Younger does not require an opportunity to levy a facial challenge.
Furthermore, Kansas case law would not have unambiguously precluded Brown from raising her federal issues. State case law does exist indicating Kansas administrative agencies are not empowered to decide constitutional questions. See, e.g., Bd. of Educ. of Unified Sch. Dist. No. 443 v. Kan. State Bd. of Educ., 266 Kan. 75, 966 P.2d 68, 76 (Kan.1998). But it would be erroneous to conclude Brown could not have raised her constitutional claim before the agency. Indeed, the most recent Kansas Supreme Court case to address this issue concluded “[t]he rule that a constitutional issue cannot be decided by an administrative agency does not necessarily preclude [an individual] from raising such an issue in that forum.” Martin v. Kan. Dep’t of Revenue, 285 Kan. 625, 176 P.3d 938, 946 (Kan.2008).
This ability to raise a constitutional issue in state administrative proceedings is relevant for a number of reasons. First, one’s ability to raise the same issues at the administrative level as at the state court level gives weight to the view that both comprise one unitary proceeding for the purposes of Younger abstention. Second, it means that if the HPA can be made aware of the federal issues, it can construe *904 the challenged Kansas statute to avoid the federal question altogether. Thus, even if not empowered to decide the constitutional issue, the agency may avoid the entire federal conflict. And third, it cuts against the argument that Brown was unambiguously precluded from asserting her federal claim. All that Younger abstention asks is whether Brown could have raised her federal claim before the HPA. Whether or not Brown would have succeeded in challenging the offending Kansas statute as applied to her case is immaterial.
And again, under the jurisdictional prohibition against facial challenges, that still leaves as-applied challenges and narrowing constructions, either of which could have adequately resolved Brown’s complaint and obviated the need for her federal lawsuit. Accordingly, there is no unambiguous authority suggesting the HPA was prohibited from considering Brown’s federal Medicaid arguments.
The administrative proceedings support this view. Brown had succeeded in her initial proceedings before the hearing officer but the agency head later overturned the result. The initial determination in Brown’s favor rested on equitable considerations of avoiding retroactivity in applying new Kansas statutory law to Brown’s preexisting benefits. It is not at all clear why proceedings that were equitable in nature could not have addressed federal Medicaid law among all other equitable considerations.
It may be possible that Brown could have raised an as-applied challenge before the HPA, that the HPA could have construed the offending Kansas statute narrowly to avoid the federal Medicaid law claim, or that the equitable nature of HPA proceedings could have taken federal Medicaid law into account. But most importantly, the Supreme Court instructs the assumption that in the absence of unambiguous authority to the contrary, Brown could have raised her federal claim in one shape or another before the HPA. Pennzoil, 481 U.S. at 15, 107 S.Ct. 1519; see also Dayton, 477 U.S. at 629, 106 S.Ct. 2718 (“But even if Ohio law is such that the Commission may not consider the constitutionality of the statute under which it operates, it would seem an unusual doctrine ... to say that the Commission could not construe its own statutory mandate in the light of federal constitutional principles.”).
The burden is on Brown to demonstrate the contrary, and she failed to do so. Her sole argument on this score relies on the HPA’s inability to address facial challenges to state welfare statutes, but this argument says nothing of other means by which Brown could have raised her federal claims before the HPA.

The De Novo Nature of State Court Review Is Immaterial

Even assuming for purposes of argument that Brown indeed could not raise her federal claim before the HPA, she could have raised this issue during state-court judicial review of the agency’s final order. Kan. Stat. Ann. § 77-617(a) (“A person may obtain judicial review of an issue that was not raised before the agency, only to the extent that ... [t]he agency did not have jurisdiction to grant an adequate remedy based on a determination of the issue.... ”). And an opportunity to raise a federal issue during state court judicial review of administrative proceedings is all Younger requires. See Dayton, 477 U.S. at 629, 106 S.Ct. 2718 (holding that adequate opportunity to raise federal issues exists when such claims “may be raised in state-court judicial review of the administrative proceeding,” even if the claims could not have been raised during the administrative proceeding itself).
*905 The contrary argument essentially relies on the following premise: We abstain only when a federal issue has been raised somewhere in the course of state proceedings, not simply when state process itself has been initiated. But this cannot be correct. In Dayton, the Supreme Court applied Younger abstention without a federal issue ever being raised in the ongoing state administrative proceedings. Id. If the focus of Younger abstention looks strictly to a state’s resolution of a federal issue, then Dayton would make no sense. Why abstain in favor of an ongoing administrative proceeding that lacks jurisdiction to address federal issues, requiring a would-be federal litigant to wait until state court judicial review to raise such issues? Abstention in these situations makes sense only if we look at the state process as a whole, including any available judicial review, de novo and otherwise. This must have been what animated the Court in Dayton and makes perfect sense in light of the Court’s treatment of the trial and appellate stages as one whole in Huffman.
The opposite conclusion leads to an absurd result where federal court abstention depends on the availability of state-court judicial review while the agency is deciding a case, see Dayton, 477 U.S. at 629, 106 S.Ct. 2718, only to then ignore the availability of state court judicial review and deny abstention once the agency has decided. A more consistent approach is to treat state court judicial review as an integral part of state administrative process. Under this approach, federal courts would abstain during the pendency of the agency’s proceedings and during the state court’s review of the agency’s order. This would let state courts play a role assigned them by state legislatures, which is to supervise administrative adjudications.
Other circuits agree that the de novo exception does not belong in the Younger abstention doctrine. On facts similar to Brown’s case — where administrative proceedings had ended but state court judicial review had not been sought — the First, Third, Fourth, and Eighth Circuits declined to write the de novo exception into Younger. See Moore, 396 F.3d at 395-96; Maymo-Melendez, 364 F.3d at 36; O’Neill, 32 F.3d at 793; Alleghany Corp. v. Pomeroy, 898 F.2d 1314, 1317-18 (8th Cir.1990).
The Eighth Circuit in Pomeroy provided a particularly illuminating discussion of the reasons why Younger abstention does not contain the de novo exception advanced by the majority here. When a state provides for judicial review of administrative proceedings in its courts and allows them to consider certain claims de novo, two important interests are triggered. Pomeroy, 898 F.2d at 1317-18. First, state courts may interpret the challenged state law in a way that obviates a federal issue. Id. at 1317 (citing Pennzoil, 481 U.S. at 11, 107 S.Ct. 1519). Second, if in fact state law is incompatible with federal law, “interests of comity are advanced, and friction reduced, if the courts of a state, rather than the federal courts, determine that [federal law] requires the state to alter its practices.” Id. at 1318 (citing Huffman, 420 U.S. at 608-09, 95 S.Ct. 1200). Although the court in Pomeroy articulated both of these interests in terms of complying with federal constitutional law, the same can be said of federal statutory law. The Supremacy Clause of the Constitution places state courts under equal duty to decide federal constitutional as well as statutory cases. U.S. Const, art. VI, cl. 2. For these reasons, Pomeroy decided against grafting the de novo exception onto the Younger abstention doctrine.
As Brown’s case comes to us, because she chose not to seek judicial review of the HPA’s final order in state courts, we have *906 no idea whether the challenged Kansas welfare statute actually raises an issue under federal Medicaid law. We thus violate the mutual respect between the federal and state courts by assuming that Kansas state courts could not interpret Kansas statutory law to avoid a federal issue. I reject the de novo exception because it invites this precise assumption. All Younger requires is that federal claims be capable of resolution “somewhere in the state process.” Maymo-Melendez, 364 F.3d at 36.
In sum, contrary to the majority’s holding, in my view Brown’s proceedings were coercive. And though the majority does not address the issue, the proceedings were also ongoing. Because the Younger elements are satisfied, the district court properly abstained, as should we. See Amanatullah, 187 F.3d at 1163 (“Younger abstention is non-diseretionary; it must be invoked once the ... conditions are met, absent extraordinary circumstances.”).
I therefore respectfully dissent.

. Although the briefs at times refer to the Kansas Division of Health Policy and Finance, it appears the HPA took over the administration of Medicaid programs in Kansas.

. The Court addressed the apparent tension between the exhaustion requirement of Huffman and the non-exhaustion principle of Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), as follows. Monroe held only that a federal § 1983 litigant need not first initiate state proceedings before filing the federal action. Huffman, 420 U.S. at 609 n. 21, 95 S.Ct. 1200 (citing Monroe, 365 U.S. at 183, 81 S.Ct. 473). Huffman, on the other hand, speaks to "the deference to be accorded state proceedings which have already been initiated and which afford a competent tribunal for the resolution of federal issues." Id. (emphasis added). The relevant distinction is whether state proceedings have been initiated: Monroe says there is no need to initiate state proceedings, but if a litigant nevertheless chooses to do so, Huffman requires the litigant to follow the state system all the way through the available appeals. Huffman, in compliance with Monroe, does not force would-be § 1983 plaintiffs into the slate system, but merely requires a litigant to accord the state system its due respect by first attempting to remedy an adverse ruling through state appellate procedures.